UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------x
DUPONT AUTHENTICATION SYSTEMS, LLC..,    302 Civ. 2193 (MRK)

                         Plaintiff,

    - against -

JAKKS PACIFIC, INC.,

                         Defendant.
-----------------------------------------------------------------x

## MEMORDANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The question to be decided on this motion is whether defendant JAKKS Pacific, Inc. ("JAKKS") entered into a contract to purchase some ten million holographic labels (the "Labels") bearing the insignia of the World Wrestling Federation ("WWF") from the plaintiff. The evidence - consisting in the main of a series of emails between the parties and between the plaintiff and the WWF - clearly demonstrates that, although the parties communicated regarding the possibility of such a purchase, they never contracted. To the contrary, the plaintiff specifically informed JAKKS, in writing, that it would need certain information from JAKKS in order to enter into a purchase agreement. It is undisputed that JAKKS never supplied the information which the plaintiff required, and that before JAKKS had garnered the needed

1

information, the WWF changed its name to World Wrestling Entertainment ("WWE")[1], obviating JAKKS's desire for the Labels. As the documentary evidence conclusively demonstrates, JAKKS, no longer having any need or desire for the WWF Labels, never contracted to purchase them.

## FACTS

JAKKS is in the toy business. Its products include figures of WWE (formerly the WWF) wrestling personalities and other wrestling related toys, which it manufactures under license from the WWE. See pp. 9, 18-19 from the transcript of the deposition of Stacey Pauly ("Pauly"), relevant pages of which are annexed to the accompanying affidavit of Bruce Robins (the "Robins Affidavit" as Exhibit M. Plaintiff manufactures, *inter alia*, holographic labels, and was licensed by the WWE to make labels for WWE related merchandise. See Amended Complaint, part of Exhibit A to the Robins Affidavit.

In mid-January, 2002, the parties communicated regarding the possibility of JAKKS ordering 10,000,000 **WWF** holographic labels from the plaintiff. Plaintiff faxed over some general information, including the fact that it had 1,000,000 such labels in inventory, and JAKKS emailed a request that the plaintiff "let [JAKKS] know **what you need from [JAKKS] to place this order**". See fax dated 1/15/02 from George Ferrera ("Ferrera") of the plaintiff to Pauly of JAKKS and email dated 1/16/02 from Pauly to Ferrera, annexed as Exhibits B and C respectively to the Robins Affidavit(emphasis added).[2] The plaintiff responded by email dated 1/16/02

---

[1] The WWE, formerly the WWF, will be referred to as the WWE in the remainder of this memorandum.

[2] Although JAKKS had never previously ordered any labels from the plaintiff, the plaintiff is operating a business which had previously been operated by another entity, from

2

(Exhibit D to Robins Affidavit) that what was needed to place the order was "your standard PO information: Bill to, Ship to, Shipping method, and requested delivery dates ... ."[3] Although plaintiff contends that these communications created a contract for JAKKS to purchase the Labels, it is clear that they did not, as confirmed by, *inter alia*, an email Ferrera sent to Florence Di Giorgio ("Di Giorgio") of the WWE on 1/17/02, a day after the plaintiff claims it entered into a contract with JAKKS, in which Ferrera stated "I have been contacted by '[JAKKS] and they **wish to place** another order ... . **Although I have not received the hardcopy yet, it looks like I will be receiving it shortly.**" 1/17/02 email from Ferrera to Di Giorgio annexed as Exhibit E to Robins Affidavit (emphasis added).

JAKKs never submitted a purchase order or any other "hardcopy", and never supplied any of the information "needed to place the order", at first because it was attempting to obtain that information from its Hong Kong office. Thus, Pauly emailed Ferrera to "hang tight, I'm waiting to hear from Hong Kong regarding their shipping requirements and whatnot". Ferrera emailed her back to "touch base" and to inquire if JAKKS "had any questions", and Pauly replied "no questions, just no specific information from Hong Kong yet." Yet on 1/23/02 JAKKS did have more questions, and Pauly emailed Ferrera, asking "'[w]hat is the lead time for materials?" See 1/17/02 email from Pauly to Ferrera, 1/22 email from Ferrera to Pauly, 1/22 email from Pauly to Ferrera, and 1/23 email from Pauly to Ferrera, collectively annexed as Exhibit F to the Robins

---

whom JAKKS had ordered labels. See pp. 6-8 of the transcript of Ferrara's deposition, Exhibit K to the Robins Affidavit.

[3] In this email, Ferrera wrote "thank you for the order", despite the fact that it is clear that there could have been no "order" at this time; in that same email Ferrera informs Pauley of the types of information JAKKS would need to provide the plaintiff, but still hadn't provided (and never did provide) for JAKKS to place the "order".

3

Affidavit.

JAKKS never did supply the information plaintiff represented to be "needed ... to place this order [for the Labels]", and never ordered the Labels, because it subsequently learned of the WWF's change of name to the WWE. See 4/3/02 email from Ferrera to Di Giorgio, Exhibit G to Robins Affidavit.[4] Nevertheless, plaintiff "jumped the gun" and manufactured the Labels, even though JAKKS had not yet placed any order, perhaps because it knew that its own agreement with the WWE, by which the plaintiff was licensed to produce and sell WWF labels, expired at the end of March, 2002. See 2/14/02 email from Richard Zucker ("Zucker") of the plaintiff to Ira Berg of the WWE, annexed as Exhibit H to the Robins Affidavit. Plaintiff finally shipped the Labels (to the wrong address in Hong Kong)[5] on May 31, 2002[6] because plaintiff's credit manager determined that "we had inventory *** and my comment was if [plaintiff is] going to collect [for the Labels] I wanted us to ship the finished goods products to JAKKS."[7]

---

[4] Even after the WWE's name change, when JAKKS followed up on the parties' initial discussions by inquiring about ordering **WWE** labels, it still had questions for the plaintiff about the process, and indicated its intention to place an order **in the future**. Thus, in his 5/29/02 email to Ferrera (Exhibit I to Robins Affidavit), Andy Rickelmann of JAKKS ("Rickelmann") stated that "[w]e **will order** 9 million [labels] at .15 each" assuming positive responses to JAKKS's questions, including "Do you have the artwork for the new WWE format?" (Emphasis added).

[5] Plaintiff got the information it needed to ship the Labels from previous orders JAKKS had placed with the prior entity operating the label business, but used a Hong Kong address for JAKKS which had since changed. See p.42 from the transcript of Ferrara's deposition (Exhibit K), p.63 from the transcript of Pauley's deposition (Exhibit M), and pp. 50-51 from the transcript of Andy Rickelmann's ("Rickelmann") deposition, relevant pages of which are annexed to the Robins Affidavit as Exhibit N.

[6] See p.31 from the transcript of Ferrera's deposition, Exhibit K to the Robins Affidavit.

[7] See p.7 from the transcript of the deposition of Thomas Robert Foster, Exhibit L to the Robins Affidavit.

4

Plaintiff's actions and communications confirmed that JAKKS had not contracted for the Labels. Thus, in addition to the admissions discussed above, plaintiff did not enter JAKKS's supposed 1/16/02 order for the Labels into its computer system until May 15, 2002 even though orders were typically entered into the system within a "few days, a week" (Ferrera Transcript, p.67; invoice, Exhibit J to Robins Affidavit). Another admission by the plaintiff that JAKKS had never ordered the labels is found in Zucker's 2/14/02 email (Exhibit H to Robins Affidavit). If JAKKS had ordered the Labels, it would have fully depleted plaintiff's inventory. See Ferrera Transcript, p.63. Yet in mid-February, 2002, a month after plaintiff claims JAKKS had ordered the Labels (see amended complaint, part of Exhibit A to the Robins Affidavit) but 3 months before plaintiff shipped the Labels, Zucker wrote that plaintiff's inventory of "10 million JAKKS stickers will be depleted with their **next order**" (Exhibit H to Robins Affidavit, emphasis supplied). In an email to Di Giorgio, sent after being informed by JAKKS that things were on hold due to the WWE name change (Exhibit G to Robins Affidavit), Ferrera wrote that Pauly had told him that "she will not be placing an order", not that she was **cancelling an already existing order**. Thus, the communications upon which plaintiff relies demonstrate that no contract for the Labels was ever entered into; plaintiff's admissions confirm that the plaintiff knew it.

## POINT ONE

### AS A MATTER OF LAW, THE PARTIES NEVER CONTRACTED FOR THE LABELS

In determining whether the parties contracted for JAKKS's purchase of the Labels from the plainitff "the Court [must be] mindful of the fundamental tenet of contract law that enforceable legal rights do not arise from contract negotiations until both parties consent to be

5

bound, or, in any event, manifest that intent to each other. More is needed than even mutual agreement on all terms under negotiation; there must be a manifestation of a consent to be bound to those terms as of a point in time before a contract may be found." Chrysler Capital Corp. v. Southeast Hotel Properties Limited Partnership, 697 F.Supp. 794, 799 (S.D.N.Y. 1988), aff'd 888 F.2d 1376 (1989)(citation omitted), cited with approval in Retrofit Partners I, L.P. v. Lucas Industries, Inc., 47 F.Supp.2d 256, 265 (D.Ct. 1999), aff'd 201 F.3d 155 (2d Cir. 2000). As set forth below, the plaintiff never manifested such "consent to be bound". Nor did JAKKS; in order to do so JAKKS would have at least had to provide the information which the plaintiff represented to JAKKS was "needed to place the order".

"We begin with the basic premise of contract law that no contract can be formed unless there is an offer and acceptance, based on the parties' mutual understanding. To establish their version of the contract, plaintiffs must prove that there was a meeting of the minds." Retrofit, *supra*, 47 F.Supp.2d at 262 (citation omitted). Plaintiff cannot meet this burden because, as a matter of law, the communications between the parties did not constitute an offer and an acceptance, and there was no meeting of the minds.

Certainly, JAKKS never made an offer. Up to 1/16/02, when plaintiff claims the parties contracted, all JAKKS did was request information about possibly purchasing labels and receive a communication from the plaintiff informing JAKKS of the information necessary for an order. Such preliminary discussions do not constitute an offer. "If the language indicates merely an intent to open negotiations which will ultimately result in a contract, or to call forth an offer in legal form from the other party it does not constitute an offer." P. Berry & Sons, Inc. v. Western Union Telegraph Co., 109 Conn. 371, 374, 146 A. 501, 502 (1929).

Nor did plaintiff's fax or email setting forth the general terms on which they would sell labels constitute an offer. P. Berry & Sons, Inc., *supra*. In Berry, a potential buyer of sauerkraut ("Berry") telegrammed a potential seller ("Moulton") and "requested Moulton to furnish it the lowest price of sauerkraut" (109 Conn. at 372, 146 A. at 501), just as JAKKS asked the plaintiff to furnish it with information about its labels, including price. Moulton responded with a telegram to Berry stating the price of its sauerkraut, just as the plaintiff communicated the labels' price and other information to JAKKS. Unlike JAKKS, however, which never furnished the information plaintiff stated was required for an order, Berry telegrammed back that it "[a]ccept[ed] two cars new kraut ... ." 109 Conn. at 373, 146 A. at 501. Nevertheless, the Court overruled a verdict after trial, and directed the trial court to enter judgment that Berry had not contracted to purchase sauerkraut from Moulton because Berry's telegram "accepting" two cars of sauerkraut "was merely an order for two cars of sauerkraut at the price named, which Moulton could have accepted or not as he saw fit." 109 Conn. at 373, 146 A. at 502. Thus, even if JAKKS had provided the information which the plaintiff designated as necessary for JAKKS to order labels, **which it never did**, such communication would not, as a matter of law, create a contract because the plaintiff "could have accepted [such "order"] or not as [it] saw fit."

Even assuming *arguendo* that the plaintiff's communication of information could be viewed as an offer, JAKKS certainly never accepted it - JAKKS never provided the information which the plaintiff stated was necessary.[8] The plaintiff never modified its "offer" and

---

[8] In fact, the plaintiff and JAKKS never got as far along in the formation process as Berry and Moulton had, but had only entered into preliminary discussions:
> Frequently, negotiations for a contract are begun between parties by general expressions of a willingness to enter into a bargain upon stated terms, and yet the natural construction of the words and the

7

communicated to JAKKS that it could accept the offer without providing the information, therefore there was, as a matter of law, no acceptance. The law is clear that absent such an offer and acceptance, there is no contract. Thus, in Brzezinek v. Covenant Ins. Co., 74 Conn.App. 1, 810 A.2d 306 (Conn.App. 2002) the Court granted summary judgment dismissing the plaintiffs' contract and estoppel claims, holding that no contract had been formed as a matter of law. The Court held that, even though the plaintiffs intended to accept defendant's offer to settle their claims, and had indicated acceptance by executing releases of such claims, they had not accepted the offer because they had not transmitted the releases to the defendant within a reasonable time. There having been no acceptance of the settlement offer, no contract was ever formed. Here, JAKKS never indicated acceptance at any time. Accord, Suffield Development Associates Limited Partnership v. Society for Savings, 243 Conn. 832, 708 A.2d 361 (1997)(reversing jury verdict and directing verdict for defendant on contract claim, holding that no contract had been formed because there had been no meeting of the minds on an essential term); Montanaro Bros. Builders, Inc. v. Snow, 190 Conn. 481, 460 A.2d 1297 (1983)(no contract where no meeting of minds on exact real property to be subject to option); Coady v. Martin, 65 Conn.App. 758, 784 A.2d 897 (Conn.App. 2001)(no agreement where no meeting of minds; writing left term to be agreed upon in the future); DeGennero v. 56 Beach Avenue, LLC., 1998 WL 920270 (Conn.Super. 1998)(no meeting of the minds where defendant modified offer before accepting,

---

> conduct of the parties is that they are inviting offers, or suggesting the terms of a possible future bargain, rather than making positive offers. *** . Rather, the courts routinely hold that such ... expressions of intention are invitations to solicit offers or to enter into a bargain rather than offers themselves.

Jeneric/Pentron, Inc. v. Dillon Co., Inc., 171 F.Supp.2d 49, 67 (D.Ct. 2001), quoting Richard A. Lord, 1 Williston on Contracts § 4.7, at 285-290 (4th ed. 1990) (footnotes omitted).

8

and revoked acceptance before plaintiff could agree to modification in writing).

It is undisputed that JAKKS submitted no purchase order to the plaintiff (which the plaintiff could have rejected) and never provided the information which the plaintiff stated, in writing, was necessary to place an order for the Labels. As set forth above, the plaintiff acknowledged, many times, that no contract had been entered into. Thus, there is no "genuine issue of material fact"[9] that JAKKS never contracted to purchase the Labels.

## **CONCLUSION**

For all the foregoing reasons, as well as those submitted in the Robins Affidavit and the exhibits annexed thereto, JAKKS's motion pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing plaintiff's complaint should be granted in its entirety.

Dated: April 9, 2004

The Defendant,

By: *Bruce Robins*
Bruce Robins - CT25687
c/o Feder Kaszovitz Isaacson Weber Skala
    Bass & Rhine, LLP
750 Lexington Avenue
New York, New York 10022-1200
(212) 888-8200

---

[9] Jeneric/Pentron, *supra*, 171 F.Supp.2d at 55.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------------------------------x

DUPONT AUTHENTICATION SYSTEMS, LLC..,   302 Civ. 2193 (MRK)

                            Plaintiff,

      - against -   **MOTION FOR**
                                         **SUMMARY JUDGMENT**

JAKKS PACIFIC, INC.,

                            Defendant.

-----------------------------------------------------------------------x

The Defendant, by its attorney, Ezio Scaldaferri, Esq., hereby moves for an order granting it summary judgment dismissing plaintiff's complaint, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

In support of this motion the defendant submits herewith:

a) a Local Rule 56(a)(1) Statement, attached;

b) the affidavit of Bruce Robins, with exhibits; and

c) a memorandum of law.

Dated: April 14, 2004

                                        The Defendant,

                              By: _____
                                  Ezio Scaldaferri - CT 07112
                                  c/o Feder Kaszovitz Isaacson Weber Skala
                                      Bass & Rhine, LLP
                                  750 Lexington Avenue
                                  New York, New York 10022-1200
                                  (212) 888-8200

## **ORDER**

The foregoing motion for summary judgment having been heard by the Court, it is hereby

Ordered:     Granted/Denied

THE COURT

By: _____

This is to certify that a copy of the foregoing motion was mailed on April 14, 2004 to plaintiff's attorney:

Alexander J. Trembicki, Esq.
Lynch, Trembicki, Martelon & Boynton
225 Main Street, Suite 103
Westport, Ct. 06880

By: _____
Ezio Scaldaferri - CT 07112
c/o Feder Kaszovitz Isaacson Weber Skala
Bass & Rhine, LLP
750 Lexington Avenue
New York, New York 10022-1200
(212) 888-8200

X:\WPDOC\Br\JakDupOrd.wpd