Exhibit K



**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------X
DuPONT AUTHENTICATION SYSTEMS, LLD:
                                      : NO. 3:02 CV 2193 (AWT)
VS                                    :
                                      : FEBRUARY 26, 2004
JAKKS PACIFIC, INC.                   :
--------------------------------X

DEPOSITION OF GEORGE FERRERA

APPEARANCES:
        FOR THE PLAINTIFF:
            ALEXANDER TREMBICKI, ESQ.
            LYNCH, TREMBICKI, MARTELON & BOYNTON
            225 MAIN STREET
            WESTPORT, CONNECTICUT 06880

        FOR THE DEFENDANT:
            BRUCE ROBINS, ESQ.
            FEDER, KASZOVITZ, ISAACSON, WEBER, SKALA, BASS
            & RHINE, LLP
            750 LEXINGTON AVENUE
            23RD FLOOR
            NEW YORK, NEW YORK 10022-1200

        SHIRLEY SAMBROOK - LICENSED COURT REPORTER
                      203  259-5903

**Page 2**

S T I P U L A T I O N S

It is hereby stipulated and agreed by and between counsel for the respective parties that all objections to questions except those as to matter of form are reserved to the time of trial.

It is further stipulated and agreed that any defect in the giving of notice of the taking of this deposition is waived.

It is further stipulated and agreed that proof as to the authority and qualifications of the Notary-Court Reporter before whom the deposition is taken is waived.

It is further stipulated and agreed that the reading and signing of the deposition by the deponent is not waived.

**Page 3**

. . .Deposition of GEORGE FERRERA, taken according to the Federal Rules of Civil Procedure, on behalf of the Defendant in the aforementioned cause, wherein DuPont Authentication Systems, LLC is Plaintiff and Jakks Pacific, Inc., is the Defendant pending in the United States District Court, District of Connecticut, pursuant to agreement of counsel before Shirley Sambrook, a Notary Public and Court Reporter in and for the State of Connecticut, County of Fairfield, at the offices of Lynch, Trembicki, Martelon & Boynton, 225 Main Street, Westport, Connecticut, at which time counsel appeared as hereinbefore set forth. . .

MR. ROBINS: My name is Bruce Robins. The attorney for the plaintiff, Mr. Alexander Trembicki, at his suggestion, I want to put on the record that my firm, I am not even going to say, you can just take it from the caption I gave you before, because it's too many names, is general counsel to the defendant, Jakks Pacific, Inc. I am admitted to practice in the State of Connecticut but not in the federal court of Connecticut. I have made application to be admitted as a visiting attorney in this case.

**Page 4**

That motion has not yet been filed or served but I have already sent it to our local counsel, Toby Schaffer, and she'll be filing and serving it shortly.

In speaking of this matter with Mr. Trembicki and the judge, Mr. Trembicki graciously indicated he did not have any objection to my being admitted as a visiting attorney and the judge indicated that it probably would not be a problem. So, I'm here to take the deposition today of the plaintiff on behalf of the defendant.

MR. TREMBICKI: I agree with what Mr. Robins just said.

G E O R G E   J.   F E R R E R A, 165 Driftwood Lane, Trumbull, Connecticut 06611, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. ROBINS:

Q    Mr. Ferrera, as you heard, my name is Bruce Robins. I'm the attorney representing Jakks Pacific in this matter. Have you ever been deposed before?

5

1    A    No.
2    Q    Okay.  So, let me just tell you a couple of the
3    ground rules.  I'm going to be asking you some questions
4    concerning the issues in this case.  You probably want to
5    wait a beat before answering, in case your attorney wants
6    to object to any of those questions.  If you don't
7    understand anything that I say, please ask me and I will
8    rephrase it because, if you answer, I'm going to assume
9    that you understood the question.  You have to give verbal
10   answers because the court reporter has to take down -- she
11   has a record.  She can't take down your nods.  Also, I know
12   there's going to be a lot of times when you know where I'm
13   going with the question.  You have to let me finish so
14   that the court reporter gets it down.  And I will let you
15   finish your answer even though I'm going to know where you
16   are going with your answer.  You are under oath.  Even
17   though you are not in a courtroom, this is testimony that,
18   as if you were sworn under oath in a courtroom, and the
19   same penalties apply for perjury.
20        Is there anything that you need to ask about the
21   procedure before we get started?
22   A    No.
23        MR. TREMBICKI: Just off the record a
24   second.
25        (momentary discussion off the record - 10:08

6

1    a.m. - 10:08 a.m.)
2        MR. ROBINS: Mr. Trembicki and I have just
3        had a discussion off the record in which we greed
4        that the usual stipulations that apply at
5        depositions apply here, to wit, all objections
6        are preserved until the trial.  The only
7        objection, generally, the only objection would be
8        as to form.
9        MR. TREMBICKI: That's correct.
10   Q    Okay.  Mr. Ferrera, could you give me a very
11   brief summary of your educational background?
12   A    Well, I went to Trumbull High School.  I
13   graduated in 1980.  And then I went to Sacred Heart
14   University and I graduated in 1985 with a business degree.
15   Q    What was your major?
16   A    Business.
17   Q    And, can you give me a summary of your work
18   history since college?
19   A    Yep.  My first job out of school was with a
20   small investment company.  I was -- I was there for a
21   very short time.  And I went to another company called
22   City Fed Mortgage, that was a mortgage company in
23   Westport, where I was a mortgage originator.  And  then I
24   went to work for People's Bank.  I was there for a short
25   time and I worked in the mortgage department.  After

7

1    People's, I went to Bank of Boston and I was also a
2    mortgage originator at Bank of Boston.  And after Bank of
3    Boston, I --     I got laid off.  I started working for
4    Xerox.  I was there for about three years and then I was
5    - laid off from there and I started work with -- with
6    Bridgestone, which is now known as DuPont Authentication.
7    Q    Approximately when did you start working for
8    Bridgestone?
9    A    September of 97.
10   Q    And you say Bridgestone is now known as DuPont
11   Authentication, the plaintiff in this action?
12   A    Yes.  It was.  They are now known as DuPont
13   authentication and  Label Systems.  Label Systems, Inc.
14   Q    Is there still an entity, existing entity, known
15   as Label Systems, Inc.?
16   A    Yes.  There is.
17   Q    Was there an interim time between when you were
18   employed by Bridgestone, when were you employed by DuPon
19   that you were employed by an entity known as Label Systems,
20   Inc.?
21   A    Yes.  There is.
22   Q    Can you tell me approximately when that interval
23   was?
24        MR. TREMBICKI: If you know.  If you don't
25        know, you don't know.

8

1    A    I don't know the exact dates but there was a time
2    that I worked for Label Systems.  It's pretty much the
3    same company.
4    Q    I'm sure your attorney has already told you this
5    but if you don't know or you don't remember, you can just
6    say that.
7    A    Okay.
8    Q    Without getting into legal characterizations, is
9    it fair to say that DuPont Authentication Systems is
10   carrying on the same business that Bridgestone did?
11   A    Yes.
12   Q    And  is it fair to say that DuPont is carrying on
13   the same business as -- that Label Systems did while you
14   were working for Label Systems?
15   A    Yes.
16   Q    Okay.  What was your position with Label
17   Systems?
18   A    Customer service rep.
19   Q    And  what were your responsibilities?
20   A    Just being key contact with customers.
21   Receiving orders.  Entering them into processing.
22   Following through on orders with the customer.  Follow-up
23   with the customer.  Seeing them through shipping, all the
24   way to shipping and --
25   Q    And  was that your job all the way through your

9

1    tenure with Label Systems?
2        A    Yes.
3        Q    And is that your job with DuPont today?
4        A    Yes.
5        Q    And you said receiving orders. Do you have any
6    responsibility for initiating orders, ie, to go out and
7    sell or solicit orders?
8        A    No. I don't.
9        Q    Does DuPont have a standard procedure for how it
10   processes orders?
11       A    By standard, what do you mean? A written format
12   of how it processes orders?
13       Q    Not necessarily written but just a procedure that
14   is followed all the time or ninety-five percent of the
15   time, when an order comes in?
16       A    Oh, yes.
17       Q    What would be the first thing that would occur
18   when an order comes in?
19       A    I would notify our production area that an order
20   has been received. That could be either verbally --
21   Generally, verbally.
22       Q    When you say that could be generally verbally,
23   are you referring to the order being verbal or your
24   instructions to the production department?
25       A    Instructions to the production department.

11

1    me and production could be in any number of ways. It
2    could be email. It could be verbal.
3        Q    Okay. Well, what does that communication consist
4    of?
5        A    It could be email. It could be verbal. Just
6    telling production that I had received an order for X
7    amount, from whatever product.
8        Q    What I mean is, what information is exchanged?
9        A    Quantity, part number, delivery date.
10       Q    Anything else?
11       A    No.
12       Q    How about address to be shipped?
13       A    Yeah. That usually comes later. That would
14   come later after the order is, you know, in process or
15   ready to ship.
16       Q    How about the name of the customer?
17       A    Could you repeat that?
18       Q    How about the name of the customer, is that part
19   of the information that is initially exchanged?
20       A    Yes.
21       Q    Between you and production?
22       A    Yes. It is.
23       Q    Now, when you say part number, what does that
24   refer to?
25       A    The part number is our internal identification

10

1        Q    Okay. How is, in the normal course of business,
2    how is an order communicated to you? When I say how, I
3    mean in person, in writing, by an email, telephone or is
4    there no -- is there no normal way?
5        A    This is an order from a customer?
6        Q    Yes.
7        A    Okay. It would be in any of those ways. Either
8    verbally, email, fax, hard copy mail.
9        Q    Okay. And when you get such an order from a
10   customer, however you receive it, is there some sort of
11   standard paperwork that you fill out?
12       A    Yes.
13       Q    What would that be?
14       A    Well, let me rephrase that. As far as standard
15   paperwork, I mean, there is a set of documents that I
16   would ordinarily -- Yeah. We would fill out a set of
17   documents. Either, I mean, it could be any -- pretty
18   much any form -- an email to our production area. So,
19   there's, I mean, there isn't a set, a set standard, a set
20   document standard.
21       Q    You don't have any standard document that you
22   would formally fill out when an order comes in?
23       A    Well, I do have documents they would fill out
24   but, you know, it's --  they are generally not standard. I
25   mean, they could be -- I mean, the communication between

12

1    for that particular label.
2        Q    And would the part number identify to production
3    exactly what printing would be on the label?
4        A    Yes. It would.
5        Q    So that if you received an order for a label with
6    a different type of design, it would have a new part
7    number?
8        A    Yes. It would.
9        Q    And, who would create that part number?
10       A    Our production area. Our development area.
11       Q    And what if you got an order for a label with a
12   new type of design, how would you -- well, strike that.
13   How would it be conveyed to production what design needed
14   to go on the label?
15       A    It would be via the part number that was assigned
16   by our development area.
17       Q    Please listen to the question. If you got an
18   order for a label with a new type of design so there was no
19   part number, how would the information be conveyed to
20   production about what needed to go on the label?
21       A    I would forward --  Actually, I would forward
22   that request to our development area for research and
23   development and, of that new part number, and then they
24   would contact me with a new part number and then I would
25   enter that into the system.

13

1    Q    You would have research and development, even if
2  the client came to you with what design they wanted, but it
3  wasn't one you had handled before?
4    A    That's correct.
5    Q    Okay?
6    A    Yeah.  I handle -- Well, no new parts, only
7  parts that are have been through our development area.  Our
8  development area handles the art work, the specifications
9  of the label and then I would enter that label into our --
10  into our -- into our product line.
11    Q    Is there an average or a standard amount of time
12  that it would take between the date that labels are ordered
13  to the date that they are shipped?
14    A    That would depend on the individual label because
15  each label is -- may require different -- different
16  materials.
17    Q    Okay.  Is it fair to say that it would take
18  longer, between order and shipment, if a new design that
19  had not been handled before, was requested as opposed to
20  one that you had previously done?
21    A    Yes.
22    Q    In your, in your six and a half years of
23  experience doing this, what is the shortest time that you
24  can remember between order and shipment?
25    A    Now would that be of a brand new label or would

14

1  that be of an existing?
2    Q    An existing label.
3    A    You are asking the shortest amount of time
4  between order and shipment of a label?
5    Q    Yeah.
6    A    It would be approximately two weeks.
7    Q    Now, you are aware of.  You are aware of
8  the dispute that is involved in this lawsuit?
9    A    Yes.
10    Q    And you are aware of the type of labels that are
11  involved in that dispute?
12    A    Yes.
13    Q    Is there a standard amount of time for that type
14  of label it takes, between order date and shipment?
15    A    Yes.  That label, because of the materials
16  involved, requires a longer lead time.  I believe it was
17  at least about four weeks.
18    Q    I'm sorry.  At least?
19    A    About four weeks.
20    Q    I apologize.  I have a cold.  My ears are stuffed
21  a little bit.
22    A    All right.
23    Q    Is it fair to say that, if possible,  DuPont
24  would process the order more quickly rather than more
25  slowly?  In other words, DuPont would process the orders

15

1  quickly as it could; is that a fair characterization?
2    A    Yes.  Absolutely.
3    Q    Is there a standard set of terms that DuPont has
4  for its orders?
5          MR. TREMBICKI: Just objection to the form.
6          You mean payment terms?
7          MR. ROBINS: Well, I'm referring to the terms
8          of -- yes, payment.  One, whether payment has to
9          be by cash, how long after shipment payment has
10          to be.
11    Q    Let's start with payment terms.  Is there a
12  standard set of payment terms that DuPont has for its
13  customers?
14    A    There are but that is set up by my credit
15  manager. Our credit manager.
16    Q    So, does it vary between customers?
17    A    It might.
18    Q    Are the payment terms something that you would
19  convey to production, when you take the initial order?
20    A    No.
21    Q    Did there come a time when you came to have
22  dealings with -- by you, I may do this later on, I'm
23  referring to DuPont, not you personally.  Did there come a
24  time when DuPont had dealings with the defendant, Jakks
25  Pacific, Inc.?

16

1    A    I'm sorry.  Could you repeat that?
2    Q    Did there come a time that you are aware of that
3  DuPont had dealings with the defendant, Jakks Pacific,
4  Inc.?
5    A    Dealings?  I --  What do you mean by dealings?
6    Q    Did there come a time that you are aware of when
7  Jakks Pacific ordered labels from DuPont?
8    A    Oh, yes.
9    Q    When was the first time, if you know, when Jakks
10  Pacific ordered labels from DuPont?
11    A    It was sometime in 2000, was the first order.
12    Q    Do you have any idea, approximately, what month
13  that was?
14    A    No.  I don't.
15    Q    Okay.  Now, that order that you are referring
16  to, 2000, was that with DuPont or was that with Label
17  Systems or was that with Bridgestone?
18    A    I'm not sure.  I'm not sure.  Yeah, I'm not
19  sure exactly.
20    Q    Okay.  Did you handle that order?
21    A    Yes.  I did.
22    Q    Is it standard at DuPont for customer service
23  reps to handle all orders from a particular customer?
24    A    Yes.
25    Q    So,  did you handle all orders from Jakks?

17

1      A    Yes. I did.
2      Q    Do you remember who you dealt with at Jakks with
3    regard to that order in 2000?
4      A    I believe it was a person called Rory Moore.
5      Q    Anybody else?
6      A    No.
7      Q    When was the next order by Jakks?
8      A    It was in May of 2001.
9      Q    Who did you deal with, with Jakks, regarding that
10    order?
11     A    It was Rory -- Rory Moore.
12     Q    Nobody else?
13     A    Nobody else.
14     Q    With regard to this order in May of 2001, again,
15    I'll ask you if you know that that order was to DuPont, to
16    Label or to Bridgestone?
17     A    I can't be sure. I can't be sure.
18     Q    Okay. During these incarnations as Label and
19    as DuPont, has the address of the place you worked always
20    remained the same?
21     A    Yes. It has.
22     Q    And the telephone number?
23     A    Yes. It has. I'm sorry. I need to add
24    something about the telephone number. The telephone
25    number, in the transition from Bridgestone to Label

18

1    Systems, there was some internal telephone number changes.
2    The telephone number may have changed.
3      Q    Okay. But not in the transformation, I'm just
4    using your word, from Label Systems to DuPont?
5      A    Correct.
6      Q    When was the next order?
7            MR. ROBINS: I'll just state on the record
8            you guys maintain it was an order. We maintain
9            it wasn't. By using the term order I'm not
10           admitting anything. If you use the term any time
11           it isn't an order, you are not waiving any
12           rights. You don't have to choose your words that
13           carefully.
14           MR. TREMBICKI: That's understood.
15     Q    Okay. When was the next order from Jakks?
16     A    January of 2002.
17     Q    Is that the order that is in dispute in this
18    lawsuit?
19     A    Yes.
20     Q    Were there any subsequent orders from Jakks?
21     A    Orders after that?
22     Q    Right.
23     A    No. There weren't.
24     Q    Okay. Who did you deal with at Jakks in the
25    January 2002 order?

19

1      A    Woman by the name of Stacey Pauley.
2      Q    Had you had any dealings with her previously?
3      A    No.
4      Q    Did you deal with anyone else at Jakks with
5    regard to that order?
6      A    No. I didn't. Well, I mean, after, much later,
7    I received a call from a Mr. Rickelmann but that was --
8    initially it was Stacey.
9      Q    Did you have any prior dealings with
10    Mr. Rickelmann?
11     A    No.
12     Q    Now the labels that Jakks was -- Jakks ordered
13    from DuPont -- When I say DuPont, I'm referring to any
14    three of the entities, I don't know what time what became
15    what. The labels that Jakks ordered from DuPont, those
16    were labels that contained a logo of the World Wrestling
17    Federation, with the WWF which later became the WWE, is
18    that correct?
19     A    Correct.
20     Q    And DuPont was able to print those labels only by
21    permission of the WWF-WWE, correct?
22     A    That's correct.
23     Q    Are you familiar with the relationship between
24    DuPont and the WWE, WWF?
25     A    The actual contract?

20

1      Q    Yes.
2      A    No. No.
3            MR. ROBINS: Just for the record, I may use
4            the term, WWF-WWE interchangeably instead of
5            saying them both every time.
6            MR. TREMBICKI: We know what you are talking
7            about.
8            MR. ROBINS: Okay.
9      Q    When you first came to work for Bridgestone in
10    1997, was Bridgestone doing labels with the WWF logo on
11    it?
12     A    No. We didn't actually get that contract until,
13    I believe it's March of 99.
14     Q    March of 99, to your knowledge, is when DuPont
15    first had an agreement with the WWF to do -- to be
16    licensed to use their logo?
17     A    Correct. March or possibly November. I -- I --
18    it was sometime late in, I believe it was, late in 99,
19    now that I think about it. It was in 99.
20     Q    Okay. DuPont is no longer doing any work
21    involving the WWE logo, correct?
22     A    Correct.
23     Q    Do you know when DuPont stopped doing work for
24    the WWE logo?
25     A    It was March, the end of March of 2002.

21

1    Q    And do you know why DuPont stopped doing work for
2    the WWE logo?
3    A    No.
4    Q    Now, in connection with orders of labels with WWE
5    material on it, did you have to deal with anyone from the
6    WWE or the WWF?
7    A    I don't know. Can you rephrase that? Sorry.
8    Q    Sure. When you got an order from Jakks, let's
9    say, or anyone, for labels involving WWE-WWF materials--
10   A    Okay.
11   Q    --did you have to consult with someone from the
12   WWE or WWF before you could take that order?
13   A    Oh, yes.
14   Q    Did you deal with -- Who did you deal with at
15   the WWF?
16   A    Florence DiGiorgio.
17   Q    Anybody else?
18   A    There was a person there by the name of Mike. He
19   worked in the legal department.
20   Q    Would that be Mike Archer, if you know?
21   A    Yes. That sounds familiar. That sounds
22   familiar.
23   Q    Did you ever have any dealings with an attorney
24   named Ira Berg?
25   A    No.

22

1    Q    What was the nature of the communications between
2    you and the WWF in connection with label orders?
3    A    When I received any orders from a WWE licensee,
4    I would notify either Florence or Mike that I received an
5    order, gave them the quantity, gave them all the order
6    detail information and I would tell them to even report
7    back to the last few orders that they have received and they
8    would send back an approval that we can go ahead and
9    ship.
10   Q    And what would happen if the WWF-WWE, did not
11   approve?
12   A    I would notify the customer immediately and say
13   that they would need to contact the WWF because I would
14   stop processing the order.
15   Q    DuPont would not process the order unless the WWF
16   approved?
17   A    Correct.
18   Q    Just to make clear, I apologize if I asked this
19   before, but the three orders that we have discussed, one in
20   2000 one in 2001, one in 2002, are those the only orders
21   placed by Jakks with Label Systems or DuPont or
22   Bridgestone?
23   A    Yes.
24   Q    And they were all for WWF licensed or WWE
25   licensed products?

23

1    A    Yes.
2    Q    Is Jakks the only -- Was Jakks the only
3    customer that Label, DuPont, Bridgestone had for WWF
4    licensed labels?
5    A    No. We had several customers for the WWF but
6    Jakks Pacific had a special -- it's own label. It was its
7    own label.
8    Q    At a certain point, I believe you said
9    approximately March of 2002, DuPont's relationship with
10   the WWE ceased, is that correct?
11   A    Yes.
12   Q    When did you learn that the, that DuPont, would
13   no longer be doing printing of WWE, WWF labels?
14        MR. TREMBICKI: Just so we are clear, do you
15        mean him personally or the company.
16   Q    Well, if you -- Let's start with you
17   personally. When did you personally learn that DuPont
18   would no longer be doing printing of WWE labels?
19   A    It was late March.
20   Q    You first learned about it in late March of 2002?
21   A    2002.
22   Q    Do you know when the company itself, DuPont,
23   first learned that it would no longer be doing these
24   labels?
25   A    Well, it was approximately the same time. Reason

24

1    I say that is because at the time we were on a, DuPont, was
2    on a month to month extension of, actually I think it was
3    every two months, an extension of the contract.
4    Q    All right. Now, you stated before that there was
5    some amount of lead time between when an order would come
6    in to when it could be shipped. What happened with regard
7    to WWE labels that, let's say, had been ordered prior to
8    the date in late March, 2002, when DuPont ceased doing work
9    with WWE but had not yet been shipped?
10   A    Well, we were given --  I mean, according to the
11   agreement, we could ship those labels up until the end of
12   March.
13   Q    So --
14   A    Or, yeah. Up until the end of March.
15   Q    Excuse me. Is it fair to say, then, I don't
16   want to put words in your mouth, but is it fair to say that
17   if DuPont had not shipped labels by the end of March, they
18   could no longer ship those labels and get paid for them?
19   A    I don't know. I don't know. I know that one
20   of our marketing people was in contact with, I believe it
21   was, one of the legal department, one of the members of
22   the legal department at the WWF and gave them a final
23   status of what we had in process. I don't know about
24   that.
25   Q    Do you know the name of that individual that you

25

1  are referring to?
2      A    Richard Zucker.
3      Q    Did you ever have any conversations with anyone
4  at DuPont regarding the need to ship all labels out by the
5  end of March 2002?
6      A    No.
7      Q    Did you ever have any kind of communications,
8  whether conversations or emails, letters, anything to that
9  effect, that you had to ship all orders out by the end of
10  March 2002?
11      A    No. I mean, if I could add? I mean, I would
12  only, only if I had a, you know, a purchase order, would I
13  ship by the end of March.
14      Q    Is there any particular form that that purchase
15  order would have to take?
16      A    No.
17      Q    It would not have to be in writing?
18      A    No.
19      Q    I want to turn specifically to the transaction in
20  2002, which is at issue in this lawsuit.
21      A    Okay.
22      Q    What is the first -- When was the first contact
23  you had regarding this January 2002 order?
24      A    It was early in January of 2002.
25      Q    And what form was that?

26

1      A    I had sent a quote to Stacey.
2      Q    Well, you sent an unsolicited quote to Stacey?
3      A    No. She had contacted me, I'm not sure if it
4  was by phone or by -- but I had sent her a quote. She had
5  requested a quote.
6      Q    So the first contact was when Stacey contacted
7  you about a possible order?
8      A    Yes.
9      Q    And you are not sure whether that was by phone or
10  in what form that took?
11      A    Correct.
12      Q    Do you remember what the substance of that first
13  communication was?
14      A    Yeah. It was a general quote on what we had in
15  the -- well, it was a quote on price and delivery for,
16  for ten million labels.
17      Q    The first communication, whether by email or how,
18  or telephone, or how it was done, Stacey asked you for
19  certain information, is that correct?
20      A    Correct.
21      Q    What information did she ask you for?
22      A    She asked me for a quote on ten million labels.
23      Q    And when you say a quote, what exactly is
24  entailed in a quote?
25      A    Price and delivery.

27

1      Q    By delivery, you mean delivery date?
2      A    Yeah. How long it would take us. How long it
3  would take us to process or lead time. Actually, I should
4  say lead time. Price and lead time.
5      Q    Okay. By price you mean price of the labels
6  themselves or did that also include everything, including
7  shipping and whatever other expenses there might be?
8      A    No. That would be just for the labels themselves.
9      Q    So the price at the end, if the order was
10  processed, would have additional things in it like
11  shipping or whatever? Other expenses?
12      A    Yes. Well, at that point we would either -- we
13  would try to use the customers -- Well, the customer
14  would supply us with a shipper and then we would ship the
15  order.
16      Q    In other words, the customer would be paying for
17  shipping directly?
18      A    Correct.
19      Q    So are there any other expenses that are not
20  included in the price quote that you give initially?
21      A    No.
22      Q    Any other information in the quote besides price
23  and delivery terms?
24      A    No.
25      Q    Now, is there any -- what information did Stacey

28

1  convey to you in that initial contact?
2      A    I don't remember exactly.
3      Q    Do you remember whether she told you the amount
4  of the labels?
5      A    The quantity, yes.
6      Q    And -- and do you remember whether she told you
7  the part number?
8      A    No.
9      Q    Did Jakks Pacific always order the same part
10  number or did it have more than one?
11      A    No. It was always the same part number.
12      Q    Okay. Do you remember whether Stacey and you
13  discussed or communicated to each other that it would be
14  the same labels as previously?
15      A    No.
16      Q    No you don't remember or no, you didn't discuss
17  it?
18      A    No. I don't remember.
19      Q    Okay. Stacey contacted you and asked for a
20  quote. You sent her a quote and when you sent her that
21  quote do you remember what, what form that took, verbal,
22  letter, email, fax? Do you remember?
23      A    The quote was faxed.
24      Q    And approximately how long after your first
25  contact was the quote faxed to Stacey?

29

1    A    Well, it must have been -- It might have been
2    within, within a day, at the most. It might have been the
3    next day.
4    Q    So, is that the standard amount of time it would
5    take?
6    A    Oh, yeah. Or sooner.
7    Q    Okay. And what happened next with regard to
8    this transaction?
9    A    And then the next I received an email from Stacey
10   saying that they wanted to go ahead and place the order.
11   Q    About how long after the faxing of the quote was
12   that?
13   A    It was the next day.
14   Q    What action, if any, did you take as a result of
15   Stacey conveying to you that she wanted, Jakks wanted, to
16   place the order?
17   A    I notified our production area that Jakks Pacific
18   placed an order for ten million stickers.
19   Q    By the way, in the initial quote, did you
20   also -- did you also tell Stacey how many of those labels
21   were in inventory, if you recall?
22   A    Yes. I did.
23   Q    How long after you received that email from
24   Stacey, did you notify production that Jakks Pacific had
25   placed an order?

30

1    A    It was the same day.
2    Q    Did you generate any paperwork as a result of
3    receiving that email from Stacey?
4    A    No.
5    Q    Do you recall whether your communications with
6    the production department was in writing?
7    A    No. No. I don't recall.
8    Q    Do you recall whether DuPont had the ten million
9    labels in inventory at the time that the order was placed?
10   A    No. We had approximately -- approximately one
11   million in inventory.
12   Q    So that DuPont would need to get the labels
13   produced before it could ship them out to Jakks, correct?
14   A    Correct.
15   Q    And do you or did you take care of getting those
16   labels produced? Did you handle that for DuPont?
17   A    No. No. I'm not in production.
18   Q    Okay. So, someone from production would have
19   handled that?
20   A    Yes.
21   Q    Do you know who it was in this case?
22   A    Well, I -- I had told Bill Mahoney. At the time,
23   he was the director of manufacturing.
24   Q    So you believe that Bill Mahoney handled having
25   these labels produced?

31

1    A    Yes.
2    Q    Now, in getting the labels produced DuPont would
3    need to place an order with its supplier?
4    A    Yes.
5    Q    And do you know when that order was placed?
6    A    No. I don't.
7    Q    Do you know if that order was placed in writing?
8    A    No. I don't.
9    Q    Is there a standard amount of time between, if
10   you know, when production learns that it needs to have some
11   labels produced and when it would place an order with its
12   supplier?
13   A    Yes. There is. But I don't know how long that
14   would be. That's not my --
15   Q    Do you know whether it would be more or less than
16   a month?
17   A    For -- Well, thinking in terms of a standard
18   label is about, I think, about two weeks. But Jakks
19   Pacific was a special --   I mean, that's a special -- it
20   was a special label.
21   Q    And it was a special label in what way?
22   A    Well, the standard, the products that we make for
23   the WWF, one was a hang tag that goes on garments and it
24   was a two by three hang tag with a holographic strip down
25   the side. The other product was a one by one sticker. It

32

1    was a holographic sticker that went right on hard items,
2    whatever that item might be. A hard item. The labels for
3    Jakks Pacific were a smaller version of that one by one
4    label and it was half by half. Half inch by half inch.
5    So that label was -- and it was specifically done for
6    Jakks Pacific.
7    Q    Is it fair to say, if I hear what you are saying,
8    that the Jakks label was special because you used somewhat
9    more of the other labels which were standard and you only
10   used this label for Jakks?
11   A    Correct.
12   Q    And because it was special, does that mean that
13   if it had -- Because it was special, you seem to indicate
14   that that would have some effect on how long it would take
15   production to order these labels from DuPont's, is that
16   correct?
17   A    I'm sorry. Not -- not order but actually
18   receive the supplies from the customer.
19   Q    It would take longer to receive the supplies
20   because it was a special time or it would take a shorter
21   time?
22   A    I believe it would take longer.
23   Q    But it would not effect how long it would take
24   DuPont to place its order with the supplier?
25   A    Correct.



33

1          MR. TREMBICKI: Just off the record.
2          (momentary discussion off the record - 10:51
3    a.m. - 10:51 a.m.)
4          MR. ROBINS: Could we mark these as --
5    Could we have this one as A and this one marked
6    as B. Let's mark the hang tag as A.
7          (Whereupon a hang tag label was marked as
8    Defendant's Deposition Exhibit A and a one by one
9    sticker label was marked as Defendant's
10   Deposition Exhibit B for identification.)
11         MR. ROBINS: Back on the record.  Mr.
12   Trembicki has produced two small exhibits which,
13   I think, are what the witness was referring to
14   before.
15   Q    Mr. Ferrera, first I am going to show you what
16   has been marked as Defendant's Exhibit A. I will ask you,
17   is this the hang tag that you referred to in your, the WWF
18   hang tag, you referred to in your testimony?
19   A    Yes.
20   Q    It's an example of the hang tag, I should say?
21   A    Yes.
22   Q    Okay. I am going to hand you or show you what's
23   been marked as Defendant's Exhibit B and ask you if this is
24   the standard WWF holographic sticker that you referred to
25   in your testimony?

34

1    A    Yes.  That is the one by one sticker.
2    Q    That is the one by one sticker, not the sticker
3    that is used by Jakks which is one half by one half?
4    A    Correct.
5          MR. ROBINS: Do we have an example of the
6    Jakks sticker?
7          MR. TREMBICKI: I don't think we do.
8    A    I went through the sample closet. I didn't see
9    any in the sample closet.
10   Q    Okay. Did there come a time, to your knowledge,
11   that the WWF logo changed?
12   A    Yes.
13   Q    Do you recall approximately when that was?
14   A    Well, in late February I was hearing the news
15   reports that the WWF and WWE, WWF, with the World Wildlife
16   Federation were in court over the -- over the use of the
17   WWF symbol.
18   Q    And it was subsequent to that, that the WWF logo
19   was changed to WWE?
20   A    Yes.
21   Q    Do you recall approximately how long after that
22   it was?
23   A    No. I don't.
24   Q    Was it ever communicated to you personally that
25   DuPont could no longer use the WWF logos? It had to

35

1    change to WWE?
2    A    No. It was not.
3    Q    Did DuPont ever sell any WWE logo merchandise?
4    A    No. We did not.
5    Q    Okay. Just to refresh where we were. You spoke
6    about receiving an email from Stacey. She wanted to place
7    the order and you notified Bill Mahoney in production of
8    the order no more than a day later. I believe that was
9    your testimony, is that correct?
10         MR. TREMBICKI: You have to speak out loud.
11   A    Yes.
12   Q    Again, the court reporter can't take down a nod
13   so that when and if we are ever reading to someone in
14   court, they won't know what the hell is going on.
15   A    Sorry.
16   Q    That's all right.  Frankly, I won't remember
17   what was going on a couple of months from now.
18         At that time that you received the email from
19   Stacey, that she wanted to place the order, did DuPont have
20   all the information it needed to process the order?
21   A    Yes.
22   Q    Did it have all the information it needed to ship
23   the order?
24   A    No.  It did not.
25   Q    What information did it not have?

36

1    A    The shipping address. Well, could I correct
2    myself there? It was, yes, Stacey had told me that she
3    would get back to me with a shipping address. The previous
4    two orders did go to the same address.
5    Q    Did Stacey ever get back to you regarding the
6    shipping address?
7    A    No. She did not.
8    Q    Did you have -- well, strike that.  Let's go
9    back a second. You received this email from Stacey. You
10   notified production. Did you do anything else in
11   connection with this order as a result of receiving that
12   email from Stacey? Let me -- Let me clarify. I mean
13   anything internally before we move onto the next
14   communication between you and Jakks?
15   A    No.
16   Q    All right. Were there subsequent communications
17   between you and Jakks concerning this order?
18   A    Yes.
19   Q    Well, let me ask the question. What was the next
20   communication between you and Jakks concerning this order
21   A    It was -- I -- I sent a couple of emails to
22   Stacey requesting the shipping addresses.
23   Q    Well, okay.  These emails were approximately
24   when?
25   A    About a week or two after the -- After the

37

1    order.
2        Q    So we are still in January or possibly early
3    February of 2002?
4        A    Still in January. Still in January.
5        Q    And how did Stacey respond?
6        A    She -- Her responses were that she was waiting
7    for information back from her Hong Kong location.
8        Q    Okay. And did you do anything internally as a
9    result of this email correspondence?
10       A    No.
11       Q    Subsequent to the series of emails in late
12   January of 2002, what was the next communication between
13   you and Jakks regarding this order?
14       A    The next communication, the next communication,
15   well, in February, I believe it was February, one of our
16   internal people had contact with -- with the WWF.
17       Q    Did you have personal knowledge of that contact?
18       A    Yes? There was an email.
19            THE WITNESS: Alex, could I talk to you
20   for a minute?
21            MR. TREMBICKI: Sure. Give me a minute.
22            (Brief discussion off the record - 11:01
23   a.m. - 11:02 a.m.)
24       Q    So we are referring now to the contact you said
25   someone else had with the WWF concerning the order?

38

1        A    Yes. In early February, Richard Zucker who was
2    then the sales rep, had contact with the WWF and they were
3    just, at that point, wrapping up the contract finalizing
4    and Richard had mentioned to -- mentioned to Ira all the
5    product that we had in inventory and he did mention the,
6    the ten million WWF stickers to Jakks.
7        Q    So, as of this time, in early February, DuPont
8    had now had the additional nine million stickers in
9    inventory?
10       A    It was about mid-February.
11       Q    And these stickers had been produced specifically
12   to fulfill the Jakks order?
13       A    Correct.
14       Q    DuPont had not -- DuPont had not placed an
15   order for the stickers prior to receiving the Jakks order?
16       A    Correct.
17       Q    Correct, it had not?
18       A    It had not. It was this order that we ordered.
19       Q    And, just to clarify, you said before that
20   Mr. Zucker and WWF representative were just wrapping up the
21   contract. By the contract, you are referring to the
22   between the WWF and DuPont, correct?
23       A    Yes.
24       Q    No -- not any agreement between DuPont and
25   Jakks?

39

1        A    Correct. Yes.
2        Q    Had there been any prior contact between, or
3    communications, between DuPont and WWF concerning this
4    Jakks order?
5        A    Yes. I had emailed Florence DiGiorgio at the WWF
6    and I requested her help in getting -- in asking the Jakks
7    Pacific to come through with a shipping address.
8        Q    Was that the first contact between DuPont and the
9    WWF concerning this order?
10       A    Yes.
11       Q    And do you recall approximately when that
12   communication was, regarding the shipping address?
13       A    It was mid-February. I just -- yeah. Mid to
14   late February.
15       Q    Okay. And what was Florence's response to that
16   communication? Strike that. First of all, that
17   communication was an email.
18       A    I don't remember.
19       Q    Okay.
20       A    I don't remember.
21       Q    All right. Do you recall for sure whether it was
22   in writing or not?
23       A    No. I don't.
24       Q    And what was Florence's response to that
25   communication about the shipping address and the helping

40

1    out with the shipping address?
2        A    I don't recall the specifics.
3        Q    Well, what was the substance of it?
4        A    The substance was that she couldn't get involved
5    or she wasn't going to get involved with, between DuPont.
6        Q    And do you recall whether Florence's response --
7    what form that took?
8        A    No. I don't.
9        Q    And were there any communications between DuPon
10   and the WWF concerning this order between that
11   communication that you referred to and the communication
12   you referred to with Mr. Zucker, in which he spoke to
13   Mr. Berg about the labels you had in inventory?
14       A    Sorry. Rephrase.
15       Q    Were there any other communications between those
16   two, the communications you had with Florence DiGiorgio
17   regarding helping out with the shipping address and the
18   communication you referred to between Mr. Zucker and
19   Mr. Berg about how many labels DuPont had in inventory?
20       A    Not that I know of.
21       Q    Are you aware of any communications between
22   DuPont and the WWF regarding this order subsequent to what
23   you talked about Mr. Zucker talking to Mr. Berg, about the
24   number of labels in inventory? I'm not characterizing
25   talks as opposed to writing.

41

1    A    Not that I know of.

2    Q    So, to the best of your knowledge, there were

3   two sets of communications between DuPont and WWF

4   concerning this order, one between you and Miss DiGiorgio

5   about helping out with the shipping address and between

6   Mr. Zucker and Mr. Berg concerning how many labels DuPont

7   had in inventory?

8    A    Yes.

9    Q    Now, going back to your communications with Miss

10  Pauley. You stated, correct me if I am, wrong but I'm

11  pretty sure you stated in late January there was a series

12  of communications with, in which you followed up with

13  Miss Pauley, to try and find out the shipping address,

14  correct?

15   A    Yes.

16   Q    Now, when was -- were there any subsequent

17  communications between DuPont and Jakks regarding this

18  order?

19   A    Subsequent to my communications with Miss Pauley?

20   Q    Subsequent to your communications with Miss

21  Pauley in January of 2002 about getting -- trying to get a

22  shipping address?

23   A    No. Not that I can recall.

24   Q    There came a time when their order was shipped

25  out, correct?

42

1    A    Yes.

2    Q    And when was that?

3    A    May of 2002.

4    Q    How did DuPont get a shipping address for that

5   order?

6    A    We shipped it to the previous two addresses,

7   To the previous two orders.

8    Q    Now, between the time, in late January when you

9   had this series of communications with Miss Pauley, and

10  shipping the order on May 2002,  did DuPont have any

11  further communications with Jakks concerning this order?

12   A    Yes. We did.

13   Q    When was that? When was the -- Was there more

14  than one of those communications, interim communications?

15   A    Well, at that time it was elevated beyond me and

16  I believe --    Actually, I -- I wasn't aware that it was a

17  real problem until my credit manager notified me that the

18  invoice wasn't being paid.

19   Q    When was that, approximately?

20   A    It was about thirty days or so after the product

21  shipped.

22   Q    So, approximately June of 2002?

23   A    Yes.

24   Q    So, I'll ask you again, because I'm not sure now,

25  do you know if there were any communications between Jakks

43

1   and DuPont between those communications between you and

2   Miss Pauley in late January 2002 and when the order shipped

3   in May of 2002?

4    A    Not between me and Miss Pauley but I know there

5   were other communications between upper level people,

6   between Rich and Ira Berg and I think that was it.

7    Q    Okay. You are aware, are you not, that Ira Berg

8   is not with Jakks, correct?

9    A    Right. I'm sorry.  Yes.

10   Q    So, are you aware --

11   A    I'm not aware of any other communication between

12  us and Jakks.

13   Q    Are you aware of any -- Are you aware of any

14  communications between the WWF and Jakks concerning this

15  order between January of 2002 and May of 2002?

16   A    Yes.

17   Q    What --   More than one?

18   A    Well, there would be the initial approval and we

19  are going -- we are scanning the whole scope of

20  conversations between January and May of 2002 between us,

21  between DuPont and Jakks or DuPont and WWF?

22   Q    Okay. I asked if you are aware of any

23  communications between the WWF and Jakks regarding this

24  order.

25   A    Oh!

44

1    Q    Between January 2002 and May of 2002?

2    A    No. I'm not.  I'm sorry.

3    Q    If you know, is this the last WWF merchandise

4   that DuPont shipped?

5    A    I don't remember.

6    Q    Do you know approximately when DuPont shipped th

7   last of its WWF merchandise?

8    A    No. I don't.

9        MR. ROBINS: Okay. I'd like to have this

10      marked as defendant's Exhibit C, please.

11      MR. TREMBICKI: What is it, Bruce?

12      MR. ROBINS: This is January 16, 2002 from

13      email from Stacey Pauley to George Ferrera.

14      MR. TREMBICKI: Thanks.

15      (Whereupon 1-16-02 email was marked as

16      Defendant's Deposition Exhibit C for

17      Identification.)

18   Q    Mr. Ferrera, I'm going to show you go what's been

19  marked as Defendant's C, which purports to be a print out

20  of an email of Stacey Pauley to you, dated Wednesday,

21  January 16, 2002 and the subject is WWF stickers.  Also,

22  on the top of it, it says George Ferrera, which probably

23  indicates that it was printed from your computer. Ask you

24  to take a look at that for a second.

25   A    Yes.

45

1    Q    Is that the, if you recall, is that the first
2    communication you received from Stacey regarding the order
3    we have been discussing?
4    A    Yes.
5    Q    Okay. And, in response to this, what's been
6    marked --
7    A    I'm sorry. The first communication would be that
8    she contacted me for a quote and then --
9    Q    So this is not a request for a quote?
10    A    Oh, no. No.
11    Q    So there was communication before this?
12    A    Yes.
13    Q    Okay. Which you don't recall whether it was in
14    written form?
15    A    Right. I --
16        MR. ROBINS: Let me get this marked as
17    Exhibit D. This is to Stacey Pauley from George
18    Ferrera dated January 15, 2002.
19        (Whereupon, an email, 1-15-02, was marked as
20    Defendant's Deposition Exhibit D for
21    Identification.)
22    Q    Mr. Ferrera, I'm going to show you what's been
23    marked as Defendant's Exhibit D. If you can take a look at
24    that for a moment?
25    A    Okay.

46

1    Q    Is -- Do you recognize that?
2    A    Yes.
3    Q    What is that?
4    A    That's the, the quote that I sent to Stacey.
5    Q    Okay. That was in response to her request for a
6    quote?
7    A    Yes.
8    Q    And do you know if it was sent to Stacey on or
9    about the date shown there, January 15, 2002?
10    A    Yes. Yes. It was sent on the 15.
11    Q    Okay. And, then, referring back to Defendant's
12    Exhibit C, was this the response you received to the quote?
13    A    Yes.
14        MR. ROBINS: Okay. Let me get this marked
15    as Defendant's E.
16        MR. TREMBICKI: Do you want to have her mark
17    them all? I'd like to take a break.
18        MR. ROBINS: Go ahead. That's fine.
19        (Whereupon the deposition was in recess from
20    11:18 a.m. until 11:23 a.m. during which time the
21    following were marked as exhibits: email,
22    1-16-02, GF to SP, as Defendant's Deposition
23    Exhibit E for Identification; emails, 1-22-02 and
24    1-23-02, as Defendant's Deposition Exhibit F for
25    Identification; email, 5-29-02, AR to GF, as

47

1        Defendant's Deposition Exhibit G for
2        Identification and a copy of Exhibit G for
3        Identification as Defendant's Deposition Exhibit
4        H for Identification.)
5    Q    Mr. Ferrera, you indicated you were, while we
6    were off the record, you had something more to stay about
7    Exhibit D?
8    A    Yes. The quotes are printed out on company
9    letterhead and then faxed to the customer.
10    Q    So, then, this copy that we are showing you is
11    not on company letterhead. Is that just a printout from a
12    later printout from your computer?
13    A    Yes. Well, it's -- it was the actual quote that
14    I would print on company letterhead and then send to the
15    customer.
16        MR. ROBINS: Okay. Well, off the record.
17        (momentary discussion off the record - 11:24
18    a.m. - 11:24 a.m.)
19    Q    Mr. Ferrera, I am going to show you what's been
20    marked as Defendant's E, which appears to have two emails
21    on it. The bottom one is one you have already spoken
22    about, Stacey Pauley on January 16, I believe it's Exhibit
23    C, and the top one appears to be an email from you to
24    Stacey, also on January 16.
25        MR. ROBINS: Just for the record, I hope we

48

1        can stipulate from the times on this it appears
2        as if the second one went before the first. That
3        is, I assume, because the three hour time
4        difference.
5        MR. TREMBICKI: Right. Correct.
6    Q    All right. Let me show you Exhibit E. I ask
7    you to look at the top email there. Do you recognize that,
8    Mr. Ferrera?
9    A    Yes.
10    Q    Who was that?
11    A    That's an email I sent to Stacey.
12    Q    So, would it be fair to say that's the email you
13    sent to Stacey responding to her email on January 16,
14    which we previously marked as Exhibit C?
15    A    Yes.
16    Q    I'm going to hand you now, two pages of what
17    appear to be emails, January of 2002, between, email
18    correspondence, between yourself and Stacey Pauley, that's
19    been marked as Defendant's Exhibit F. I'd ask you to take
20    a couple of minutes to read through them.
21        Do you recognize those emails?
22    A    Yes. I do.
23    Q    Are those the emails you referred to before when
24    you were discussing how you kept sending emails to Stacey
25    asking her for shipping information?

49

```
1     A    Yes.
2     Q    And her responses to you?
3     A    Yes.
4     Q    Are you aware of any other communications that
5  would fall in that category, communications between you and
6  Stacey, regarding shipping information?
7     A    I'm trying to recall. I can't remember.
8     Q    You can't recall if there were any other
9  communications?
10    A    No. I don't recall.
11    Q    Okay.
12    A    There might have been another email or two.
13  I -- I can't recall right now. I mean, there were a
14  couple of phone calls that I tried to call her but --
15    Q    Okay. Did you take notes of any of those
16  telephone calls?
17    A    No. I didn't.
18    Q    Is there anything in writing reflecting those
19  telephone calls, that you know of?
20    A    Not that I know of.
21    Q    And any recording of them?
22    A    No.
23    Q    Okay. I'm going to show you now what has been
24  previously marked Defendant's Exhibit G, which appears to
25  be an email from Andy Rickelmann to you dated May 29,
```

50

```
1  2002. I'd ask you to take a look at that.
2     A    Okay.
3     Q    To your knowledge, is that the next communication
4  that you received or that would -- was that the
5  communication between DuPont and Jakks concerning this
6  order, after the emails that are Exhibit F, and with the
7  exception of possible telephone communication you said may
8  also have taken place?
9     A    I believe it is. Yes.
10    Q    Is it fair to say, then, that between January of
11  2002 and this email in May 29, 2002, there was no
12  communication between Jakks and DuPont regarding this
13  order?
14    A    Yes.
15    Q    And as of -- First of all, do you recall if you
16  first saw this email on or about the date that is on it,
17  May 29, 2002?
18    A    Yes.
19    Q    And as of that date, May 29, 2002, had the
20  labels already been shipped?
21    A    Yes.
22         MR. ROBINS: I just realized what I had
23         marked as Exhibit H is actually the same as
24         Exhibit G. It's just been printed out from Andy
25         Rickelmann's computer. So I will not be using
```

51

```
1  that.
2         ALex, I have a page that I want to use,
3  actually continues on the next page, but the only
4  thing on the next page is the --
5         MR. TREMBICKI: That's fine.
6         MR. ROBINS: So I will just use this page.
7         Could we have this marked as Defendant's
8  Exhibit I, please?
9         (Whereupon, four emails were marked as
10        Defendant's Deposition Exhibit I for
11        Identification.)
12    Q    Before we get to this Exhibit, on prior Exhibit,
13  I believe it was E, let's --    let me just check. Right.
14  I'm going to show you, again, Exhibit E, referring
15  specifically tot top email in which you state you are
16  credit approved for the order?
17    A    Yes.
18    Q    What did you mean by that?
19    A    That they were approved for us to extend credit
20  terms to the customer and to cover that ten million piece
21  order.
22    Q    Approved by who?
23    A    Approved by our credit department. Well, Tom
24  Foster is our credit manager.
25    Q    It's not referring to any sort of approval from
```

52

```
1  the WWF?
2     A    Correct. Right.
3     Q    Correct, it is not?
4     A    Correct it is not. It is our internal credit
5  approved.
6     Q    Now, I believe you testified before that you also
7  needed approval from the WWF before you could ship an
8  order, is that correct?
9     A    That's correct.
10    Q    As of the time that you sent Exhibit E, the top
11  email on Exhibit E, do you know whether the WWF had
12  approved the Jakks order?
13    A    Which one was Exhibit E?
14    Q    This is E. I am referring to the top email
15  there.
16    A    No. I did receive approval from the WWF but I
17  don't recall the date. It was --    It might have been the
18  same day or, yeah, about the same day.
19    Q    All right. I will show you what's been marked as
20  Defendant's Exhibit I, which I think will refresh your
21  recollection. It appears to be a series of four emails
22  between Florence DiGiorgio and George Ferrera, the first of
23  which, on the bottom, is dated January --    they are all
24  dated, I'm sorry, January 17, 2002.
25    A    Okay.
```

53

1    Q    Do you recognize the emails on Exhibit H?
2    A    Yes.
3    Q    Are those the emails, email correspondence, you
4  had with the WWF concerning getting this Jakks order
5  approved?
6    A    Yes. They are.
7    Q    And does that refresh your recollection as to
8  whether, when you sent that first email that is on Exhibit
9  E, the order had been approved by the WWF?
10   A    Well, yeah. It wasn't approved by the WWF at
11  this point.
12   Q    At the point when you sent the email on Exhibit
13  E?
14   A    Yeah. The credit approval was just internal
15  credit approval. We have done business with them so, you
16  know, it was in the past, and--
17   Q    Okay.
18   A    So, yeah.
19   Q    Again, I just want to clarify, when you said we,
20  you are still not sure whether that was Bridgestone, Label
21  or DuPont that had previously done business with Jakks?
22   A    Correct. Correct.
23   Q    Just want to take a look at this for one second.
24  I want to refer you to the second email from the top here
25  on Exhibit I, from you to Florence DiGiorgio, specifically

54

1  your statement there that we are planning to ship by
2  January 30.
3    A    Yes.
4    Q    Is that statement referring to the ten million
5  labels ordered by Jakks?
6    A    Yes.
7    Q    That you intended to ship by January 30?
8    A    Yes.
9    Q    And the labels, though, weren't shipped until May
10  of 2002, correct?
11   A    Correct.
12   Q    Why was that?
13   A    Well, we were waiting for shipping confirmation
14  from Stacey.
15   Q    Okay. But, eventually, you did ship even though
16  you didn't receive the shipping confirmation?
17   A    Yes.
18   Q    As of the date, as of January 17, 2002, do you
19  know whether DuPont had ordered the additional nine million
20  labels from its supplier?
21   A    No. I didn't. No. I don't.
22   Q    You don't know or you hadn't?
23   A    No. I don't know.
24        MR. ROBINS: I guess I'd like to have this
25        marked as Exhibit J. This is DuPont's invoice.

55

1        MR. TREMBICKI: What's the date on this,
2  Bruce?
3        MR. ROBINS: I think the date is 5-10-02.
4        (Whereupon, an invoice, 5-10-02, was marked
5        as Defendant's Deposition Exhibit J for
6        Identification.)
7    Q    I'm going to show you, Mr. Ferrera, what is
8  marked as Defendant's Exhibit J, which appears to be an
9  invoice dated May 10 of 02 on DuPont letterhead. Says
10  bill to Jakks Pacific. I ask you to look at this for a
11  second.
12   A    Okay.
13   Q    Is that the invoice for this order that we have
14  been discussing?
15   A    Yes. It appears to be.
16   Q    Okay. And is that --    is that a standard form,
17  DuPont invoice?
18   A    Yes. It is.
19   Q    Now I know down there in the corner over here,
20  there's a space for purchase order number which is left
21  blank in this form, correct?
22   A    Yes.
23   Q    Why is there no purchase order number indicated
24  there?
25   A    Well, I used Stacey's name as a purchase order.

56

1  number. In the previous orders with Jakks I, I mean, I
2  used Rory's name as a -- as a purchase order number.
3    Q    Okay. But, in this particular case, it's fair
4  to say there was no written purchase order with a number
5  and that's why you used Stacey's name rather than a number?
6    A    Yeah. Only the email.
7    Q    Were there any other customers besides Jakks for
8  which you would use something other than a purchase order
9  number on your invoice?
10   A    Yes.
11   Q    Is that the --    strike that. Okay. Is it the
12  general practice at DuPont to have the purchase order
13  number for its invoices?
14   A    Yes. But that purchase order number can be in
15  any form. I mean, it could be a person's name as a
16  purchase order number or a person. If a person ordered
17  something over-the-phone, I would use that person's name
18  or a date that I received a fax or some reference. I
19  would use that as a reference.
20   Q    What information would be contained in a purchase
21  order, whether received on the phone or in writing?
22        MR. TREMBICKI: Just object to the form.
23        Are you talking about --  I mean, are you asking
24        him to say what would be in other people's
25        purchase orders?

57

1    MR. ROBINS: Well, yes. I am. If he
2 knows.
3    MR. TREMBICKI: Okay.
4    Q    Let me try and rephrase the question.  Is there
5 a general set of information that would be on a purchase
6 order, whether that purchase order is received verbally or
7 in writing?
8    A    Yes.
9    Q    And what information would that be?
10    A    Bill to, address, ship to, product number,
11 quantity, method of shipment.
12    MR. ROBINS: I'm sorry. I need to take a
13 bathroom break.
14    (Whereupon the deposition was in recess from
15 11:42 a.m. until 11:49 a.m. during which time the
16 following were marked as exhibits: fax cover
17 sheet, 7-12-02/letter, as Defendant's Deposition
18 Exhibit K for Identification; email, 1-28-02, as
19 Defendant's Deposition Exhibit L for
20 Identification; invoice, 1-31-01, as Defendant's
21 Deposition Exhibit M for Identification, emails,
22 4-5-02 and 2-14-02, as Defendant's Deposition
23 Exhibit N for Identification and an invoice,
24 5-15-01, was marked as Defendant's Deposition
25 Exhibit O for Identification.)

58

1    Q    Mr. Ferrera, I want to go back for a second to
2 Exhibit E and refer to you the top email there, where you
3 are writing to Stacey, hey, Stacey and thank you for the
4 order.
5    A    Okay.
6    Q    Is it fair to say, judging by this email, that at
7 this point, on January 16, you believed that you had an
8 order, the order that is in issue here?
9    A    Yes. Correct.
10    Q    And the basis for that belief is the email
11 correspondence that had been exchanged up to January 16, is
12 that correct?
13    A    Correct.
14    Q    There are no other oral communications or any
15 other communications that we haven't, we haven't
16 identified, here that form the basis for your belief there
17 was an order placed at this time?
18    A    Right.
19    MR. TREMBICKI: Just object to the form
20 because I, I think, there was also the quote of
21 January 15 that was part of this.
22    MR. ROBINS: I was including the quote of
23 January 15. Yes.
24    Q    Perhaps to be clearer, is there any other
25 communications that has not been marked as an exhibit here

59

1 that form the basis or part of the basis of your belief
2 that an order had been placed by Jakks as of January 16?
3    A    That's right.  I -- I --  These two
4 communications were all involved.
5    Q    That's right. I asked a yes or no.
6    MR. TREMBICKI: It was yes or no.
7    A    Okay.
8    Q    Yes or no, the communications that form the basis
9 of your belief there was an order have all been identified
10 at this deposition as exhibits?
11    A    Yes.
12    Q    Okay.  Let's move on to Defendant's Exhibit K,
13 which is two pages, a fax cover sheet dated July 12 of 02,
14 followed by a letter which is not on letterhead but appears
15 to be to Andy Rickelmann from Thomas Foster.  I'd ask you
16 to look at this Exhibit a second.
17    Had you seen that letter prior to this
18 litigation?
19    A    No.
20    Q    Okay.  There ain't nothing to ask you about!.
21 Okay. I'm going to show you what's been marked as
22 Defendant's Exhibit L which appears to be a series of
23 emails between you and Stacey Pauley with the top and
24 latest one dated January 28, between you and Bill Mahoney,
25 from you to Bill Mahoney.  I ask you to look at that for a

60

1 second.  Okay.  You may have already testified to this but
2 who is Bill Mahoney?
3    A    Bill is the director of manufacturing for DuPont
4 Authentication systems.
5    Q    And did you send an email to him on or about the
6 date that's indicated, January 28, 2002?
7    A    Yes. I did.
8    Q    What was the purpose of sending that email?
9    A    It was regarding their shipping requirements.
10    Q    I'm sorry.  Could you clarify that? I don't
11 understand what you mean by regarding their shipping
12 requirements.
13    A    It's their shipping address in Hong Kong.
14    Q    Had you had prior communications with Bill
15 regarding this order, prior to this email?
16    A    I don't remember. I don't remember.
17    Q    So you think -- I'm sorry. I don't mean to
18 interrupt.
19    A    That's all right.  The -- I -- I don't remember
20 what the conversation was that -- as to why I sent that to
21 Bill.
22    Q    Okay.  I am going to show you what's been marked
23 as Defendant's Exhibit N, I ask you, which appears,
24 purports to be a series of emails between people at DuPont
25 and people at the WWF, with the last one being from you to

61

1   Richard Zucker. I'd ask you to take a look at that,
2   please.
3       A    Okay.
4       Q    Can you tell me, do you recognize those emails?
5       A    Yes. I do.
6       Q    Can you tell me generally what they are?
7       A    Well, the first one, the one at the bottom,
8   February 14, was the result of Richard Zucker discussing
9   with Ira the current production, current inventory on
10  hand. The next step is I had sent to Florence, after
11  discussion I had with Stacey, Stacey told me that her
12  orders were on hold because of a logo change and then the
13  top one, on April 5, is the email that I sent to Richard
14  Zucker requesting his assistance.
15      Q    Okay. Referring to the middle one there, saying
16  you had a conversation with Stacey in which it was said the
17  orders were on hold because of the logo change. Prior to
18  that communication with Stacey, did you know of the logo
19  change?
20      A    No. No.
21      Q    Okay?
22      A    Only from what I heard, was hearing in the news,
23  that -- I think that there was the big dispute over the
24  use of the logo.
25      Q    That communication you were speaking of with

62

1   Stacey said the orders were on hold because of the logo
2   change?
3       A    Yes.
4       Q    Was that in writing?
5       A    No. It wasn't.
6       Q    It was over the telephone?
7       A    Yes.
8       Q    Do you recall approximately when that was?
9       A    Approximately, it -- Well, it would have been
10  the same day because that would have been big. That would
11  have been big news.
12      Q    Okay. I'll refer back to the previous exhibit
13  for just a second. I thought it said something. It
14  didn't. Referring to Exhibit N, again. Referring to the
15  bottom email on February 14. I'm referring to -- I'll hand
16  this back to you in a second but there's a line in there,
17  the sentence that states, as agreed, the ten million Jakks
18  stickers will be depleted with their next order and the
19  other two items should be substantially, if not completely,
20  depleted by March 31, 2002, termination of our agreement.
21  That's on the bottom there, underneath the numbers. Now,
22  it appears that you were copied on that email. Did you
23  see a copy of that email on or about the date it was sent?
24      A    Yes.
25      Q    And do you know what Mr. Zucker's referring to

63

1   when he speaks of the termination of our agreement?
2       A    Yes.
3       Q    That was what?
4       A    That was the termination of the, of DuPont
5   Authentication manufacturing hang tags and stickers for
6   licensees.
7       Q    An as of the time that this email was sent, the
8   stickers from this order had not been shipped yet,
9   correct?
10      A    That's right. Correct.
11      Q    And, so, DuPont had, as it states in that email,
12  ten million of the Jakks stickers on hand?
13      A    Yes. At that point the order was, was almost
14  complete. Was complete.
15      Q    But that inventory would have been depleted by
16  the shipment of the current Jakks order, is that correct?
17      A    Correct.
18      Q    I want to refer back to the emails between
19  yourself and Miss DiGiorgio on Exhibit I, Mr. Ferrera.
20  Referring to the bottom email from you to Miss DiGiorgio
21  dated January 16 at 8:59 a.m. You get to work early. I am
22  referring to the first sentence after hi, Florence. I have
23  been contacted by Jakks Pacific and they wish to place
24  another order for ten million of the one half by one half
25  stickers. I ask you to look at that a second. Now, if

64

1   I understand your testimony correctly, as of the time that
2   email was sent to Miss DiGiorgio, the order had already
3   been placed, is that correct?
4       A    Yes.
5       Q    Why did you state that they wished to place an
6   order rather than they placed an order?
7       A    That was just a terminology. I notify them and,
8   I mean, most of my emails were, to her, were in that
9   format. You know, X company wants to place an order for
10  this or they wish to place an order for that. That was
11  the format.
12           MR. ROBINS: Off the record.
13           (momentary discussion off the record -
14           12:05 p.m. - 12:06 p.m.)
15      Q    Referring to Exhibit N, which I'll give you back
16  in a second, the second email from the top, again, from you
17  to Miss DiGiorgio. I'm referring to the sentence there, I
18  spoke with Stacey today and she told me that all of her
19  orders are on hold because of the WWF logo change so she'll
20  not be placing an order for the ten million stickers, as
21  she verbally requested. I ask you to look at that.
22  Okay?
23      A    Okay.
24      Q    Do you know why you used the terminology will not
25  be placing an order rather than something along the lines

65

1 of she cancelled her order or she wants to back out of her
2 order?
3   A   No. Just--
4   Q   Was it your --  I don't mean to interrupt.
5   A   That's all right. No.  Just terminology.
6   Q   But, was it your understanding, as of the time
7 you sent this email, that the order had not been placed or
8 it had already been placed?
9   A   It had already been placed and that she was --
10 she was looking to cancel her order.
11   Q   I have these marked so I might as well go
12 through them. I wasn't really going to.  I am going to hand
13 you what's been marked as Defendant Exhibit M, which
14 appears to be an invoice from Label Systems, Inc. to Jakks
15 dated 1-31-01.  I'd ask you to take a look at that.
16   A   Okay.
17   Q   Can you tell, from looking at that invoice, that
18 refers to the order, the 2000 order from Jakks, that we
19 previously discussed?
20   A   No. It doesn't.
21   Q   It doesn't?
22   A   No.  This is a previous order.
23   Q   I thought that the first order there was in 2000?
24   A   Oh, I'm sorry.  In 2000.  This is the middle
25 order.

66

1   Q   That's the middle order, not the first order?
2 Let me hand you what's been marked, already marked, as
3 Exhibit O.  I think comparing the two may help you
4 understand the chronology.
5   A   Right.  This is the middle order.  This is the
6 first order.
7   Q   The first order, you are referring to Exhibit M,
8 correct?
9   A   Yes.
10   Q   And the middle order, Exhibit O?
11   A   Yes.
12   Q   Looking at Exhibit M, the first one there?
13   A   Yes.
14   Q   Can you tell from that piece of paper,  when the
15 order was placed and when it was shipped?
16   A   No.  I can't.
17   Q   Well --
18   A   Oh, when it was shipped.
19   Q   You can tell when it was, when the order was
20 placed, and when it was shipped?
21   A   When it was shipped is the invoice date because
22 we -- we invoice on the date that an item ships.
23   Q   What is that date, in this case?
24   A   January -- Well, this original, this invoice,
25 was for shipping charges for an order that was shipped on

67

1 December 31.
2   Q   And can you tell when that order was placed?
3   A   No, not when it was placed.  I would have to
4 look up in our system and backtrack by the -- by the order
5 number.  There is no --
6   Q   I have some other documents. I'm wondering
7 whether it is worth it to go through them.  Let me see this
8 for a second.  You guys ship things out on New Year's Eve?
9   A   Yes.
10   Q   Very industrious.  I see my mistake.  All right.
11 Let's move on to Exhibit O.  I'll ask you the same
12 question. Can you tell, from this invoice, when the order
13 was placed and when it was shipped?
14   A   Yes.
15   Q   And when was that order placed?
16   A   Well, let me backtrack.  The order date on this
17 invoice is the date that the -- this -- this was entered
18 into the system.  And it was on May 15.
19   Q   It was shipped when?
20   A   On May 31.
21   Q   And the --  Typically, how long after an order
22 is placed is it entered into the system?
23   A   Within -- within a few days, a week.
24   Q   It's fair to say it's likely this order we are
25 referring to in Exhibit O was actually placed within a week

68

1 prior to the date it was entered into the system?
2   A   Yes.
3   Q   Okay.  Do you know when the order that is at the
4 center of this dispute was entered into your system,
5 DuPont's system?
6   A   It was verbally entered in, in January.
7   Q   What do you mean by verbally entered in?
8   A   Well, when I -- it is my notification to
9 production that an order was placed for X amount for --
10   Q   That sort of verbal notification would not
11 generate, would not allow you to generate an invoice with
12 an order date, is that correct?
13   A   Right.  If, I think --
14   Q   Go ahead.  Clarify.
15   A   You are right, to a point, but the date, like
16 when we generate an order, the date we put it in the
17 system, it will come up to the date that, you know, the
18 date the order was in the system.  And when it ships, the
19 invoice date would be the date that it ships.  When I enter
20 an order, when I tell production that I have an order for a
21 certain label, that would constitute me verbally telling
22 them that an order was placed.
23   Q   Okay.
24   A   But, then you mentioned -- I'm sorry.  I lost my
25 train of thought.

69

1  Q    Do you want to take a moment to try and recover
2  it?
3  A    Actually, could I just get a drink of water?
4      MR. ROBINS: Sure.
5      (brief interruption - 12:14 p.m. - 12:15
6  p.m.)
7  Q    Okay.   Did you recover your train of thought?
8  Do you want to continue on explaining your answer?
9  A    Could you repeat that question.  The question
10  before the question that led up to that.
11  Q    If the court reporter can find it.  I couldn't
12  possibly.
13      (Whereupon the last several questions and
14  answers were read by the reporter.)
15  Q    Do you have anything further to add to your
16  answer?
17  A    No.  I don't.
18  Q    Okay.  I understand what you are saying about
19  the oral notification to the production department but I'm
20  asking you now specifically at what point was Jakks 2002
21  order entered, the information from that order, entered
22  into DuPont's computer system?
23  A    In May.  Early in May.
24  Q    Early in May of 2002?
25  A    Only for billing purposes.

70

1      MR. ROBINS: Okay.  It's possible that I
2  missed it.  I don't think I have ever -- Well, I
3  guess I wouldn't have seen it.  Strike that.  I
4  think that's all I have for Mr. Ferrera if you
5  guys can give me two or three minutes to look
6  through my notes to see if there's anything else?
7      MR. TREMBICKI: Sure.
8      (Whereupon the deposition was in brief
9  recess from 12:17 p.m. until 12:19 p.m.)
10  Q    Just a couple of more questions.  You spoke
11  with Stacey and she told you that her orders were on hold
12  because of the logo change.  Can you remember any more of
13  that conversation regarding the logo change?
14  A    No.  No.  Just what I captured in the email.
15  Q    Do you recall whether Stacey told you, along --
16  something along the lines that Jakks would not be able to
17  use any of the old logo stickers anymore?
18  A    No.  I don't recall that.
19  Q    Okay.  As of the time that these stickers were
20  shipped, in May of 2002, is it fair to say that had DuPont
21  not shipped those to Jakks at that time, that it would not
22  have been able to sell those stickers anywhere else?
23  A    That's correct.  It's -- It was a custom order.
24  Q    But what I'm referring to is the fact that those
25  stickers used the WWF logo, is that correct?

71

1  A    Yes.
2  Q    And I believe you testified before you weren't
3  sure if, if it was the last of the WWF merchandise that
4  DuPont sold.  Strike that.   What I'm getting at, isn't it
5  a fact, Mr. Ferrera,  that because the logos on the sticker
6  were WWF, regardless of whether it was specially ordered or
7  not, DuPont would not have been able to sell those stickers
8  because WWF had changed its name by that time to WWE?
9  A    That's correct.
10      MR. ROBINS: That's all I have.
11      MR. TREMBICKI: Just a couple of questions,
12  Mr. Ferrera.
13  CROSS EXAMINATION BY MR. TREMBICKI:
14  Q    Do you have any knowledge of how long the WWF
15  stickers were useful to any of its licensees, at the time
16  of the termination of the contract, that is?
17  A    No.  No.
18  Q    Do you -- withdrawn.  With regard to the question
19  that Mr. Robins was asking you about when something gets
20  entered into your system, is there any set procedure or
21  pattern at DuPont or Label Systems or Bridgestone for when
22  an order gets entered into your system so it would show up
23  on a bill as an order date?
24  A    Not specifically,  no.
25  Q    Is there any specific procedure or paperwork that

72

1  is generated by you after you get an order, and you turn it
2  over to the production department?
3  A    That could be in any form.  It could be an
4  email.  It could be a note.  It could be a memo.  It's
5  very informal.
6  Q    Okay.  The last question is Mr. Robins asked you
7  if you had any communication with Jakks Pacific from the
8  period January of 2002, when the order came in, to May of
9  2002, when you had the email from Mr. Rickelmann that we
10  previously spoke about.  Having reviewed Plaintiff's
11  Exhibit N for Identification, the emails from yourself to
12  Miss DiGiorgio, does that refresh your recollection as to
13  whether or not you had any direct communication with Jakks
14  during that time period?
15  A    Yes.  There was conversation with Stacey in which
16  she told me that her orders were on hold.
17  Q    Okay.  Aside from that, which is referred to in
18  the email of April 3 of 2002 from yourself to Miss
19  DiGiorgio, correct?
20  A    Yes.
21  Q    Aside from that telephone conversation,  did you
22  have any other conversations with anyone from Jakks during
23  that time period, that is, from January of 02 to May of
24  2002?
25  A    No.

73

1    Q    Okay. Did you make any efforts to contact anyone
2    from Jakks concerning the status of the order during that
3    time period?
4    A    That was after what date, Alex?
5    Q    After January of 02 up until May of 02?
6    A    No. Only what I sent in my emails. I made
7    contact -- Actually, I did make contact or attempted to
8    make contact, with Stacey on more than one occasion, more
9    than via phone, and she was unavailable. She was -- I had
10   a couple of excuses that they had given me. She was either
11   at a trade show or she was out of the office for a period
12   of time.
13   Q    Did you leave her any voice mails? What did you
14   do?
15   A    I would have left her -- Yes. I left her voice
16   mails and my name and contact, my name and number.
17   Q    Why were you calling her?
18   A    Just to follow-up on -- follow-up on shipping
19   information and --
20   Q    Is it fair to say that the first contact that you
21   had back from Stacey was what you referenced in your email
22   regarding the phone call?
23   A    Yes.
24        MR. TREMBICKI: No further questions.
25        MR. ROBINS: Let me just follow-up.

74

1        MR. TREMBICKI: He may have some more.
2        MR. ROBINS: Yes.
3   REDIRECT EXAMINATION BY MR. ROBINS:
4    Q    Did you make any attempts to contact Stacey or
5    anyone else from Jakks after that conversation referred to
6    in your email in which she said her orders were on hold?
7    A    Not that I can remember.
8    Q    When you received -- Let me see if I can find
9    the Exhibit. Referring to Exhibit G. You received that
10   email from Andy Rickelmann on or about the time it was
11   sent, May 29?
12   A    Yes.
13   Q    And we have already established that the labels
14   had already been shipped by that time?
15   A    Yes.
16   Q    What was your reaction to Mr. Rickelmann's email
17   in which he appears to be inquiring about placing an order
18   for goods which have already been shipped?
19        MR. TREMBICKI: I object to the
20        characterization. I think the email says what it
21        says.
22   Q    What was your --
23        MR. ROBINS: Fair objection.
24   Q    What was your reaction to email from
25   Mr. Rickelmann?

75

1    A    Actually, I had called him and spoke to him
2    directly and I told him that they were already in transit,
3    probably reaching his dock soon.
4    Q    And do you recall what Mr. Rickelmann replied to
5    that information?
6    A    He -- He seemed surprised. He said, "Oh,
7    really? Okay." And then -- and that was the end. It
8    was brief. I told him the product was in transit. He
9    seemed surprised and he said he would look into it. And I
10   believe I sent him some tracking information after that.
11   I might have sent him some tracking information. The--
12   Q    I'm sorry. I didn't mean to interrupt.
13   A    That's all right.
14   Q    Did you and Mr. Rickelmann discuss, at that time
15   or at any time, whether those labels were the old WWF or
16   the new WWE labels?
17   A    I don't think so.
18   Q    Okay. I had a question in my head. Do you know
19   why you didn't try and contact Jakks immediately before
20   shipping out the labels to let them know you were shipping
21   them?
22   A    No.
23        MR. ROBINS: That's all I have.
24        MR. TREMBICKI: I have no further questions.
25   Thanks.

76

1        (Whereupon the deposition concluded at 12:27
2    p.m. having commenced at 10:04 a.m.)
3
4
5
6
7            *        *        *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

77

| | | | PAGE | LINE |
|---|---|---|---|---|
| 1 | | I N D E X | | |
| 2 | WITNESS | EXAMINATION | | |
| 3 | G. FERRERA | DIRECT-ROBINS | 4 | 22 |
| 4 | | CROSS-TREMBICKI | 71 | 13 |
| 5 | | REDIRECT-ROBINS | 74 | 3 |
| 6 | | | | |
| 7 | DEFENDANT EXHIBITS | | PAGE | LINE |
| 8 | A ID HANG TAG | | 33 | 7 |
| 9 | B ID STICKERS | | 33 | 7 |
| 10 | C ID EMAIL 1-16-02  SP-GF | | 44 | 15 |
| 11 | D ID EMAIL 1-15-02  GF-SP | | 45 | 19 |
| 12 | E ID EMAILS 1-16-02 GF-SP | | 46 | 19 |
| 13 | F ID EMAILS 1-22-02 & 1-23-02 | | 46 | 19 |
| 14 | G ID EMAIL 5-20-02 AR-GF | | 46 | 19 |
| 15 | H ID COPY OF EXHIBIT G | | 46 | 19 |
| 16 | I ID FOUR EMAILS | | 51 | 9 |
| 17 | J ID INVOICE  5-10-02 | | 55 | 4 |
| 18 | K ID FAX COVER SHEET/LETTER | | 57 | 14 |
| 19 | L ID EMAIL 1-28-02 | | 57 | 14 |
| 20 | M ID INVOICE  1-31-02 | | 57 | 14 |
| 21 | N ID EMAILS  4-5-02 & 2-14-02 | | 57 | 14 |
| 22 | O ID INVOICE  5-15-01 | | 57 | 14 |

23

24

25

78

## CERTIFICATION

1

2    STATE OF CONNECTICUT    ss: Bridgeport

3    COUNTY OF FAIRFIELD:

4

5        I, Shirley Sambrook, a Notary Public duly
commissioned and qualified in and for the County of
6    Fairfield, State of Connecticut, do hereby certify that
pursuant to agreement of counsel there came before me on
7    the 26th day of February, 2004 at the offices of Lynch,
Trembicki, Martelon & Boynton, 225 Main Street, Westport,
8    Connecticut, the following named person, to wit: GEORGE
FERRERA, who was by me duly sworn to testify to the truth
9    and nothing but the truth of his knowledge touching and
concerning the matters in controversy in this cause; that
10   he was thereupon carefully examined upon his oath, and his
testimony reduced to writing under my supervision, that the
11   deposition is a true record of the testimony given by the
witness.

12       I further certify that I am neither attorney or
counsel for, nor related to or employed by any of the
13   parties to the action in which this deposition is taken,
and further that I am not a relative or employee of any
14   attorney or counsel employed by the parties thereto or
financially interested in the action.

15       In witness thereof, I have hereunto set my hand and
affixed my notarial seal this ___ day of _____,
16   2004.

17   My Commission Expires:    _____
                              SHIRLEY SAMBROOK
18                            Notary Public

19

20

21

22

23

24

25