**Exhibit L**

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF CONNECTICUT
3
4    - - - - - - - - - - - - - - -x
5    DuPONT AUTHENTICATION SYSTEMS,LLC :
6    VS                              : NO.3:02 CV 2193 (AWT)
7    JAKKS PACIFIC, INC.             : FEBRUARY 26, 2004
8    - - - - - - - - - - - - - - -x
9
10    DEPOSITION OF THOMAS ROBERT FOSTER
11
12    APPEARANCES:
13
14    FOR THE PLAINTIFF:
15        ALEXANDER TREMBICKI, ESQ.
          LYNCH, TREMBICKI, MARTELON & BOYNTON
16        225 MAIN STREET, SUITE 103
          WESTPORT, CONNECTICUT 06880
17
18    FOR THE DEFENDANT:
19
20        BRUCE ROBINS, ESQ.
          FEDER, KASZOVITZ, ISAACSON, WEBER, SKALA, BASS
21        AND RHINE LLP
          750 LEXINGTON AVENUE
22        NEW YORK, NEW YORK 10022-1200
23
24
25    SHIRLEY SAMBROOK - LICENSED COURT REPORTER
                  203  259-5903

---

2

1
2
3            S T I P U L A T I O N S
4        It is hereby stipulated and agreed by and
5    between counsel for the respective parties that all
6    objections to questions except those as to matter of
7    form are reserved to the time of trial.
8        It is further stipulated and agreed that any
9    defect in the giving of notice of the taking of this
10    deposition is waived.
11        It is further stipulated and agreed that proof
12    as to the authority and qualifications of the
13    Notary-Court Reporter before whom the deposition is
14    taken is waived.
15        It is further stipulated and agreed that the reading
16    and signing of the deposition by the deponent is not
17    waived.
18
19
20
21
22
23
24
25

---

3

1                    . . .Deposition of THOMAS ROBERT FOSTER,
2    taken according to the Federal Rules of Civil Procedure, on
3    behalf of the Defendant in the aforementioned cause,
4    wherein DuPont Authentication Systems, LLC is Plaintiffs
5    and Jakks Pacific, Inc. is the Defendant pending in the
6    United States District Court, District of Connecticut,
7    pursuant to agreement of counsel before Shirley Sambrook, a
8    Notary Public and Court Reporter in and for the State of
9    Connecticut, County of Fairfield, at the offices of Lynch,
10    Trembicki, Martelon & Boynton, 225 Main Street, Suite
11    103,Westport, Connecticut, at which time counsel appeared
12    as hereinbefore set forth. . .
13
14
15              MR. ROBINS: Mr. Foster, my name is Bruce
16        Robins. I represent Jakks Pacific, the defendant
17        in this action.  And the reporter is about to
18        swear you in.
19
20
21    T H O M A S   R O B E R T   F O S T E R, 288 Governor's
22        Hill Road, Oxford, Connecticut 06478, having
23        been duly sworn, was examined and testified
24        as follows:
25

---

4

1    DIRECT EXAMINATION BY MR. ROBINS:
2        Q    Mr. Foster, have you ever been deposed before?
3        A    Yes. I have.
4        Q    Okay.  So you know generally what is going on.
5    I'm going to ask you some questions about this case.
6    Probably want to wait a beat before you answer, in case
7    your attorney objects.  If you don't understand the
8    question, just ask me to rephrase it. I will.  If you
9    answer the question, then I will assume you understood it.
10    And that's really about it.  You are sworn so you know you
11    are not in court but it's understood the same penalties of
12    perjury, as if you were in court.  Is there anything you
13    need to ask me about the procedure?
14        A    Not at all.
15        Q    Okay.  Give me a very brief summary of your
16    educational background?
17        A    I have a BS degree from Post College.
18        Q    Post on Long Island?
19        A    No.  Post in Waterbury.
20        Q    I live on Long Island, so --
21        A    Okay.
22        Q    When did you receive that?
23        A    1983.
24        Q    Could you please give me a brief summary of your
25    work history since college.

5

1    A  I was employed in the banking industry up until
2  seven years ago, which time I became a credit manager for
3  Bridgeport Machines on a temporary basis, and have been
4  with Label Systems, or one different affiliation of the
5  same place, for the last six years.
6    Q  So you know, we have already been through this
7  and agree that if I use Bridgeport or Label Systems or
8  DuPont --
9    A  Yes.
10    Q  So you have been a credit manager with, as you
11  said, one of the other of those entities since 1997, seven
12  years ago?
13    A  It would be, I believe, six years this April.
14  So, we do the math, probably 88.
15    Q  98?
16    A  Yes. I'm sorry. 98.
17    Q  That's your current position, is credit manager?
18    A  Yes.
19    Q  Okay.  What are your responsibilities as credit
20  manager?
21    A  Approving terms for all new customers.  And
22  once the invoices are on the books, collecting them.
23  Also, once a month I'm responsible for inventory of
24  certain products, Motorola Division, and our holographic
25  products.

6

1    Q  So, you'd be responsible for inventory of
2  holographic labels such as the ones that are at issue here?
3    A  Yes. I was.
4    Q  Can you recall the first time that you had any
5  contact with Jakks Pacific?
6    A  I approved their initial credit for their first
7  order.
8    Q  Do you recall approximately when that was?
9    A  I know we have documents here that would refresh
10  my memory but I don't know exactly.  I mean, I do know
11  it's on their first order, probably somewhere three or four
12  years ago, but I don't have --
13    Q  If there are any documents, it's not really that
14  critical, but if there are any documents that refresh your
15  recollection, feel free to look at them.
16    A  I know we have a signed credit application and
17  that was the first time, 11-15-00. It's signed. I
18  approved it shortly after that. So that would be a very
19  good approximate date of my first contact with Jakks.
20    MR. TREMBICKI: Just for the record, he's
21  referring to application for credit from Jakks
22  Pacific dated November 15, 2000 which was
23  produced in our production responses.
24    MR. ROBINS: Okay.
25    Q  When was the next time, after approving the

7

1  credit application, that you had any dealings with or about
2  Jakks?
3    A  Jakks always paid on time and I believe the next
4  time I had anything significant to do with Jakks would have
5  been going forward when we made the last shipment to Jakks,
6  the one that we are in question.
7    Q  Okay.  And, what -- what was that contact?
8    A  Well, it wasn't actually with Jakks themselves.
9  We had been told in April that Jakks had put all orders on
10  hold.  We felt very strongly that we had an existing order
11  and a decision came down to --  we had inventory
12  downstairs.  We were going to --  We wanted to be paid for
13  what we had produced and my comment was if I am going to
14  collect it, I want us to ship the finished goods product to
15  Jakks.
16    Q  Okay.  First -- I'm sorry.  I didn't mean to
17  interrupt.  First, who told you that Jakks had put the
18  order on hold in April?
19    A  There was our customer service rep had finally
20  been able to talk to, I believe it was Stacey Pauley,
21  who said all her orders were on hold and that's the first
22  time we had any inkling there was even an issue or problem
23  with the goods we had produced.
24    Q  Okay.  Let me ask you, DuPont, or one of those
25  entities, had an agreement with the WWF to produce WWF

8

1  branded merchandise, hang tags, labels, etc, correct?
2    A  Correct.
3    Q  Do you know when that agreement first came into
4  being?
5    A  No.
6    Q  That agreement at a certain point terminated. Do
7  you know approximately when that agreement terminated?
8    A  No.  Again, it is -- it is-- there was a letter
9  here somewhere in this correspondence that said when that,
10  when that had terminated.  But, no.  I wasn't party to the
11  agreement with the WWF.  My job responsibilities wouldn't
12  take me in that direction at all.
13    Q  Do you recall whether that agreement terminated
14  before or after you learned that Jakks order was on hold?
15    A  I don't know.
16    Q  At a certain point in time,  I'm sure you are
17  aware, that WWF changed its name to WWE?
18    A  Yes.
19    Q  Do you know approximately when you became aware
20  of that?
21    A  Again, that has, I -- I don't know.  It has
22  nothing to do with credit in our standpoint and I wouldn't
23  be in that loop.
24    Q  Again, I'm sorry.  Again, in relation to learning
25  that Jakks order was on hold, do you know whether you

9

1  learned of the WWF name change before or after that?
2      A   We -- It was published in the papers on the
3  lawsuit brought by the World Wildlife Federation against
4  the WWF. My knowledge of this came not from inside my
5  company but from watching the news at six-thirty at night.
6      Q   And, was that before you learned that the Jakks
7  order was on hold?
8      A   The Jakks order was on hold in, we were told, I
9  believe in April and, yes, I -- I believe I had some
10 knowledge of a WWF name change prior to that.
11     Q   I'm not sure, you may have answered this. So I
12 apologize. That was, the first knowledge you had
13 regarding this Jakks order, was when you learned it was on
14 hold in April of 2002?
15     A   Correct.
16     Q   You had no prior conversations with anyone at
17 DuPont regarding the order?
18     A   No. Jakks was a great credit without any problem
19 and one of my highest rated credit-worthy accounts. So, I
20 mean, from a credit standpoint with Jakks there had never
21 been an issue or problem. We shipped them the goods. They
22 paid us on their first two orders. No. I had I wanted
23 more customers like Jakks, is what I wanted.
24     Q   All right. Just to be complete, you had no
25 discussions with anyone from the WWF regarding this Jakks

10

1  order, either?
2      A   No. I have never -- I have never spoken to the
3  WWF until after a letter I wrote to Andy Rickelmann.
4      Q   Speaking of which letter, I'm going to show you
5  what's been previously marked as Defendant's Exhibit C,
6  which consists of two pages, including a fax cover sheet,
7  on DuPont letterhead and a letter printout, of which is not
8  on letterhead, but appears to be Andy Rickelmann from you.
9  I'll ask you to review it.
10     A   Yes.
11     Q   Yes. What --
12     A   That's the letter I had wrote. I never had
13 contact with WWF after -- until after this letter.
14     Q   That's what I was going to ask you. Okay. Let
15 me ask you, sir, where did you get the information? From
16 what source did you get the information that -- that you
17 used to create this letter?
18     A   What information are you speaking of?
19     Q   Well, you have information there concerning how
20 much the order was, how much, what the price was. I don't
21 have it in front of me but there's other information in
22 there and you said the first thing you had heard of the
23 order was in April. I'm asking where you got this
24 information.
25     A   By the time this letter was written, we had

11

1  shipped the goods to them. We had an invoice on our
2  system, number 2374, in the amount of one hundred fifty
3  thousand seventy-five dollars. That's where I received
4  the information on the price, invoice number and the dollar
5  amount. When I went into the next line, that it was put
6  on hold because of the wrong printing, that information was
7  garnered from a telephone call I had with an accounts
8  payable clerk whose name I have no idea, when the invoice
9  first went.
10     Q   Accounts payable clerk at Jakks?
11     A   At Jakks. Who told me, initially who said send
12 me an invoice, we'll get this paid. And about two weeks
13 later, we never got paid. I called her back and at that
14 time she told me Andy Rickelmann put it hold because of the
15 wrong printing. Then where I went in before on the WWF
16 logo, on the wrong printing, that was basically deemed by
17 the -- whenever an order came in from a licensee, the WWF
18 had ultimate approval. They could reject any order coming
19 in even though a vendor had ordered it from us. If the WWF
20 would not allow you to sell it to them, we couldn't sell it
21 to them. The information garnered on the wrong printing
22 was based on the fact that WWF had approved this order.
23 They knew what we were selling. They knew what we were
24 selling to Jakks and they knew how much. The WWF did not
25 have a problem with us selling these stickers to Jakks with

12

1  this logo on it.
2      Q   Do you know when the WWF had approved it?
3      A   There is an email in file because we never went
4  to production anywhere without WWF approval. We couldn't.
5  There's an email from someone named Florence to someone,
6  that I have seen.
7      Q   I'll show you what's been marked as Defendant
8  Exhibit I. It's a series of emails on January 17, 2002.
9  I'll ask you if that's the email correspondence that you
10 have just been referring to?
11     A   Yes. It's the up here, re Jakks, go ahead.
12         MR. ROBINS: Just for the record, that is the
13         top email on this exhibit. It's from Florence
14         DiGiorgio to George Ferrera with a cc to Mike
15         Archer dated Thursday, January 17 2002. And
16         I'm not going to get into the time because of the
17         time difference it would just confuse things.
18     Q   Do you recall whether that, as of January 17,
19 2002 the WWF had changed its name or changed its logo to
20 WWE?
21     A   I have no knowledge of that.
22     Q   Let me show you what's been marked as Defendant's
23 Exhibit J which purports to be a DuPont Authentication
24 Systems invoice. Ask you if that's the invoice you were
25 referring to before. I believe it is the same number.

13

1    A    The number here is very blurred but it appears to
2    be the actual invoice number which would give me a hundred
3    percent confidence that it's the same but this appears to
4    be -- this appears to be the same invoice I was speaking
5    of.
6    Q    Is that a standard form for DuPont Authentication
7    invoice?
8    A    Yes.
9    Q    I notice in the space where, down here, where it
10   states purchase order number, there isn't any. Is that
11   unusual on an invoice, DuPont invoice?
12   A    I have seen invoices marked with people's names
13   who gave an email to produce goods, quite a few times.
14   Q    Did you have any conversations with Mr. Ferrera
15   regarding the order, before you created the letter that is
16   part of Exhibit K?
17   A    I don't recall any specifically but I would
18   assume, before I wrote a letter like this, that, yes, I
19   would have had a discussion with George on what was going
20   on.
21   Q    But you don't recall specifically?
22   A    I -- I don't recall any.
23   Q    I'm going to show you, just to refresh your
24   recollection, document email dated Wednesday, January 16,
25   2002, from Stacey Pauley to George Ferrera. It's been

14

1    previously marked as Exhibit C. It's just to refresh your
2    recollection as to dates.
3    A    Okay. See, on this I wouldn't have had any
4    discussion on that, again. Jakks was well credit
5    approved. Never had a problem. This order would be just
6    typed into the system and go through without me needing to
7    be aware of anything.
8    Q    If an order came in on January 16, would it be
9    usual that it would not be shipped until May, if you know?
10   A    Again, I really don't have any expertise in that
11   area. I have nothing to do with production.
12   Q    By the way, the letter that we have been
13   referring to, I believe it's Exhibit K, was it in fact sent
14   on July 12 of --
15   A    Yes. It was, even though -- Yes.
16   Q    Do you recall having any communications with
17   anyone at DuPont regarding the need to get rid of the WWF
18   inventory prior to termination of the agreement with WWF?
19   A    I -- No. I never would have.
20   Q    How about any communications with anybody
21   regarding the need to get rid of WWF inventory before the
22   name changed to WWE?
23   A    No.
24       MR. ROBINS: I think that's probably all I
25   have for Mr. Foster. Just give me a minute.

15

1    It's not all. I am sorry. There are some other
2    things.
3    Q    I'm going to show you -- Did I get these things
4    mixed up? I'm going to show you documents previously
5    marked as Exhibits D and E -- D and E -- D, E and F.
6    Just ask you to take a look at them. Did you review any
7    of those prior to writing the letter we have marked as
8    Exhibit, I think it's Exhibit K?
9    A    I don't recall specifically what I did but as
10   soon as I realized this was a problem, my normal mode of
11   action would have been to get any information I could and
12   every piece of information I could, review it before I put
13   down anything. So I am sure I did see those emails prior
14   to writing that letter but I can't sit here and swear to
15   it. But the way I would normally work, yes, I wouldn't
16   write something like that, when we have a problem, without
17   trying to gather all of the facts. These would have been
18   part of the facts. I'm sure I did review them.
19   Q    Do you recall specifically whether you did
20   discuss their content with anyone, other than your
21   attorney? I'm not implying you did but that would be
22   privileged so I wouldn't ask about --
23   A    No. I wouldn't have discussed that with anyone
24   else but our attorney.
25   Q    Do you recall the -- When did you -- strike

16

1    that. When did you first learn that there was a problem?
2    A    I believe it was back in April when we had found
3    out from Stacey all orders were on hold and now we said,
4    wow, we have a problem that we didn't even know existed
5    with an order for Jakks that we had produced.
6    Q    So that was prior to sending out the invoice?
7    A    Correct.
8    Q    That was prior to your conversation with the
9    Jakks clerk in which she initially indicated that it would
10   be paid?
11   A    Correct.
12   Q    And after you -- after you sent this letter,
13   strike that. In the letter you indicate that you had been
14   unable to speak with Mr. Rickelmann about the matter and,
15   therefore, sent him a letter, is that correct?
16   A    Correct.
17   Q    So, you had no conversation with Mr. Rickelmann
18   about the matter, prior to sending him the letter?
19   A    Correct. That was the whole purpose of the
20   letter. For two days I had tried calling him, after I
21   realized there was a problem, and he didn't return my
22   calls. And he probably was -- Probably part of the
23   terseness in the letter, was the fact I had waited two days
24   and I had not gotten a call back and at that point I
25   realized we had a major problem.

**Page 17**

1  Q  Subsequent to sending the letter, did you speak
2  to Mr. Rickelmann about the letter?
3  A  Subsequent, yes. He called me apologetically
4  shortly thereafter, I'd say within a day or two, for not
5  calling me back right away. And I don't remember what the
6  excuse was but there was one and -- but he was there to
7  speak to me.
8  Q  And can you recall the substance of that
9  conversation?
10  A  To be honest with you, no. Not -- I know
11  initially I can tell you what I remember and what the
12  feelings were. I think I have talked to Mr. Rickelmann two
13  or three times alone. And my remembrance of the first
14  conversation had to do with the art work issue. Primarily,
15  I said, what do you mean, it was the wrong art work? And
16  it was pretty much an argument back and forth that, wait a
17  minute, you ordered this. And then I think he argued with
18  whether he ordered it or not, a little bit. You had this
19  order, the WWF approved it. They knew what we were
20  selling. How can you be arguing the wrong art work with me
21  now? And then I believe on one other occasion we sort of
22  went through our parameters of what we did because he was
23  under the impression we had inventoried goods and we just
24  dumped them out. And I tried to explain to him that that's
25  not what happened at all. If it matters at all, we can go

**Page 18**

1  through all this and what happened. And I said I can even
2  send up documents to back this up. I don't know where you
3  are under this impression but that's not what happened
4  here. But that was that was pretty much it.
5  Q  Okay. And in connection with your conversation
6  with Mr. Rickelmann, do you recall any discussions you had
7  with any DuPont people about Mr. Rickelmann's claims or
8  about the situation in general?
9  A  When it came into the collection area, it's
10  pretty much mine. I mean, I didn't go --  When this came
11  to Andy and myself, I -- there was nobody else at DuPont
12  to talk to. This is now in my ball club.
13  Q  You had all the information you felt you needed
14  to deal with the information, at that point?
15  A  I don't know if I would ever make that comment,
16  that I had all the information, but there's just nobody
17  else for me to go to at DuPont, I think is more my point.
18  I'm the credit manager. This is my area of expertise.
19  When it comes into collecting problem documents, if I need
20  to talk to anybody outside, it would be my attorney. Not
21  someone in-house.
22  Q  Maybe you are misunderstanding me. Did you --
23  What I mean is did you talk with anyone regarding asking
24  them when the order came in, in what form did the order
25  come in, was the order for the old art work and the new art

**Page 19**

1  work or anything in connection with what you and  Mr.
2  Rickelmann had discussed?  I understand that collecting
3  problems are yours but --
4  A  Oh! I may have but there were no big meetings.
5  It was in conversations with people in their office,
6  quickly, to gather something or ask somebody what does this
7  piece of paper have.  I'd say I'm sure I did but I have no
8  definitive recollection and there were no big meetings on
9  this, where people were called in regarding Jakks.
10  MR. ROBINS: I think that's all I have.
11  MR. TREMBICKI: Okay. I have no questions.
12  MR. ROBINS: Thank you, Mr. Foster.
13  (Whereupon the deposition concluded at 2:33
14  p.m. having commenced at 2:07 p.m.)
15
16
17
18
19  *      *
20
21
22
23
24
25

**Page 20**

1
2                        CERTIFICATION
3  STATE OF CONNECTICUT
4  COUNTY OF FAIRFIELD:          ss: Bridgeport
5
6      I, Shirley Sambrook, a Notary Public duly
   commissioned and qualified in and for the County of
7  Fairfield, State of Connecticut, do hereby certify that
   pursuant to agreement of counsel there came before me on
8  the 26th day of February, 2004 at the offices of Lynch,
   Trembicki, Martelon & Boynton, 225 Main Street, Suite 103,
9  Westport, Connecticut, the following named person, to wit:
   THOMAS ROBERT FOSTER, who was by me duly sworn to tes-
10  tify to the truth and nothing but the truth of his knowledge
   touching and concerning the matters in controversy in this
11  cause; that he was thereupon carefully examined upon his
   oath, and his testimony reduced to writing under my
12  supervision, that the deposition is a true record of the
   testimony given by the witness.
13
      I further certify that I am neither attorney or
14  counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is taken,
15  and further that I am not a relative or employee of any
   attorney or counsel employed by the parties thereto or
16  financially interested in the action.
17      In witness thereof, I have hereunto set my hand and
   affixed my notarial seal this ___ day of _March_ ,
18  2004.
19  My Commission Expires:     _Shirley Sambrook_
                              SHIRLEY SAMBROOK
20      2008                   Notary Public
21
22
23
24
25

**17**

1  Q  Subsequent to sending the letter, did you speak
2  to Mr. Rickelmann about the letter?
3  A  Subsequent, yes. He called me apologetically
4  shortly thereafter, I'd say within a day or two, for not
5  calling me back right away. And I don't remember what the
6  excuse was but there was one and -- but he was there to
7  speak to me.
8  Q  And can you recall the substance of that
9  conversation?
10  A  To be honest with you, no. Not -- I know
11  initially I can tell you what I remember and what the
12  feelings were. I think I have talked to Mr. Rickelmann two
13  or three times alone. And my remembrance of the first
14  conversation had to do with the art work issue. Primarily,
15  I said, what do you mean, it was the wrong art work? And
16  it was pretty much an argument back and forth that, wait a
17  minute, you ordered this. And then I think he argued with
18  whether he ordered it or not, a little bit. You had this
19  order, the WWF approved it. They knew what we were
20  selling. How can you be arguing the wrong art work with me
21  now? And then I believe on one other occasion we sort of
22  went through our parameters of what we did because he was
23  under the impression we had inventoried goods and we just
24  dumped them out. And I tried to explain to him that that's
25  not what happened at all. If it matters at all, we can go

**18**

1  through all this and what happened. And I said I can even
2  send up documents to back this up. I don't know where you
3  are under this impression but that's not what happened
4  here. But that was that was pretty much it.
5  Q  Okay. And in connection with your conversation
6  with Mr. Rickelmann, do you recall any discussions you had
7  with any DuPont people about Mr. Rickelmann's claims or
8  about the situation in general?
9  A  When it came into the collection area, it's
10  pretty much mine. I mean, I didn't go --  When this came
11  to Andy and myself, I -- there was nobody else at DuPont
12  to talk to. This is now in my ball club.
13  Q  You had all the information you felt you needed
14  to deal with the information, at that point?
15  A  I don't know if I would ever make that comment,
16  that I had all the information, but there's just nobody
17  else for me to go to at DuPont, I think is more my point.
18  I'm the credit manager. This is my area of expertise.
19  When it comes into collecting problem documents, if I need
20  to talk to anybody outside, it would be my attorney. Not
21  someone in-house.
22  Q  Maybe you are misunderstanding me. Did you --
23  What I mean is did you talk with anyone regarding asking
24  them when the order came in, in what form did the order
25  come in, was the order for the old art work and the new art

**19**

1  work or anything in connection with what you and  Mr.
2  Rickelmann had discussed?  I understand that collecting
3  problems are yours but --
4  A  Oh! I may have but there were no big meetings.
5  It was in conversations with people in their office,
6  quickly, to gather something or ask somebody what does this
7  piece of paper have.  I'd say I'm sure I did but I have no
8  definitive recollection and there were no big meetings on
9  this, where people were called in regarding Jakks.
10  MR. ROBINS: I think that's all I have.
11  MR. TREMBICKI: Okay. I have no questions.
12  MR. ROBINS: Thank you, Mr. Foster.
13  (Whereupon the deposition concluded at 2:33
14  p.m. having commenced at 2:07 p.m.)
15
16
17
18
19  *      *
20
21
22
23
24
25

**20**

1
2                        CERTIFICATION
3  STATE OF CONNECTICUT
4  COUNTY OF FAIRFIELD:          ss: Bridgeport
5
6      I, Shirley Sambrook, a Notary Public duly
   commissioned and qualified in and for the County of
7  Fairfield, State of Connecticut, do hereby certify that
   pursuant to agreement of counsel there came before me on
8  the 26th day of February, 2004 at the offices of Lynch,
   Trembicki, Martelon & Boynton, 225 Main Street, Suite 103,
9  Westport, Connecticut, the following named person, to wit:
   THOMAS ROBERT FOSTER, who was by me duly sworn to tes-
10  tify to the truth and nothing but the truth of his knowledge
   touching and concerning the matters in controversy in this
11  cause; that he was thereupon carefully examined upon his
   oath, and his testimony reduced to writing under my
12  supervision, that the deposition is a true record of the
   testimony given by the witness.
13
      I further certify that I am neither attorney or
14  counsel for, nor related to or employed by any of the
   parties to the action in which this deposition is taken,
15  and further that I am not a relative or employee of any
   attorney or counsel employed by the parties thereto or
16  financially interested in the action.
17      In witness thereof, I have hereunto set my hand and
   affixed my notarial seal this ___ day of _March_ ,
18  2004.
19  My Commission Expires:     SHIRLEY SAMBROOK
20      2008                   Notary Public
21
22
23
24
25