UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DuPONT AUTHENTICATION SYSTEMS, LLC<br>      Plaintiff<br><br>V.<br><br>JAKKS PACIFIC, INC.<br>      Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO.:
3:02 CV 2193  (MRK)

JUNE 7, 2004

## MEMORANDUM IN OPPOSITION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**FACTS:**

The plaintiff, DuPont Authentication Systems, Inc. (hereinafter known as DAS), located in Bridgeport, Connecticut, is engaged in the sale and manufacture of pressure sensitive labels including holographic labels. (Ex. H, pp. 7.) The holographic labels manufactured by DAS are used by its customers for product authentication of officially licensed goods. In the instant case, DAS had an agreement with the World Wrestling Federation (WWF) to manufacture and sell WWF holographic products to its approved vendors for use on WWF officially licensed products. Before an order could be processed by the plaintiff it had to be approved by the WWF.

Thus, a system was set up wherein the plaintiff would receive orders from its customers for holographic products using the WWF logo. Before the plaintiff could fill any such orders it needed to obtain approval from the WWF to manufacture the goods for that particular customer. (See Ferrera testimony, Ex. B, pp. 21-22.)

The defendant, Jakks Pacific, Inc. is a toy manufacturer, based in Malibu, California, engaged in _inter alia_ the manufacture of WWF licensed toys. The plaintiff and its predecessor, Label Systems, Inc., began a business relationship with Jakks on or about November 14, 2000. In its initial order Jakks ordered 10 million ½" by ½" holographic labels from the plaintiff. The plaintiff produced the stickers, shipped them and was paid by Jakks. On May 11, 2001 Jakks issued a second purchase memo for 10 million of the same ½" by ½" holographic stickers to the plaintiff. That order was also filled and paid for by the defendant. (See Ferrera testimony, Ex. B, pp. 16-18; Foster testimony, Ex. C, pp. 5-7.)

In both of these orders the product was produced in accordance with the defendant's specifications. The part produced for the defendant had specific dimensions and was not a stock item. Not only did it have specific artwork (WWF logo) but it was a special size (½" x ½") manufactured exclusively for the defendant. The price in both orders was the same. The products were delivered to the same address in Hong Kong. (See Ferrera testimony, Ex. B, pp. 36; Mahoney testimony, Ex. H, pp. 9-11.)

On January 15, 2002 the plaintiff (George Ferrera) issued a quote to the defendant (Stacey Pauly) in response to a request for the same by the defendant.  (See Ex. A.)  The quote was for 10 million of the same ½" x ½" holographic stickers previously purchased by the defendant.  It specified a delivery date of January 31, 2002.  On January 16, 2002 the defendant issued an e-mail to the plaintiff requesting 10 mm holographic labels for the WWF.  (See Ex. D.) Ferrera issued a confirming e-mail thanking Pauly for the order and telling her that Jakks was already credit approved. (See Ex. E.)  The plaintiff, acting in reliance on the order, sought and received approval from the WWF to produce the order for Jakks.  (See e-mail from Ferrera to Florence DiGiorgio of WWF, Ex. F.)  This was important for the plaintiff because these were certain lead times required in order to obtain the materials necessary to manufacture the products.  The defendant in the past sought quick turn around time for the manufacture of its products.  Moreover, its quote specified that delivery was to be by January 31, 2002.  The plaintiff went ahead and manufactured the goods and was awaiting shipping instructions from the defendant.

After the labels were manufactured, the WWF was required to change its name and consequently its logo as a result of litigation brought against it by the World Wildlife Federation.  Thus, the WWF became the WWE.  This logo change meant that the defendant (and all other WWF/WWE licensees) would be required to change the labels they used.  There were certain lead times built into the

changeover. Originally the end date was August, 2002. It was then extended to October 11, 2002. (See Ex. O.) Moreover, at the end of March of 2002, the plaintiff's contract with the WWF/WWE to manufacture its holograms expired.

From the time of the order and its manufacture by the plaintiff, Ferrera had been attempting to contact Pauly to obtain a shipping address. (Ferrera testimony, Ex. B, pp. 41, 72-73.) In April, 2002 Pauly suddenly advised the plaintiff that her orders were on hold due to the logo change. (See Ex. K.) Finally, in May, 2002 the plaintiff shipped the holograms to the same address in Hong Kong it had shipped its prior two orders. (See Ferrera testimony, Ex. B, pp. 42.)

On or about May 29, 2002, Andy Rickelmann, director of purchasing for the defendant, issued an e-mail to the plaintiff inquiring about acquiring the required holograms. (See Exhibit E, attached.) At that juncture the defendant had almost run out of the holograms needed in its manufacturing operations from the defendant. The e-mail refers to 1 million pieces on hand that are the old style and further confirms an order for an additional 9 million at $0.015 each. This e-mail tracks exactly the information in the plaintiff's original quote. The defendant was informed that the labels had already been shipped.

In July, 2002 the plaintiff billed the defendant for the subject holograms. The defendant refused to pay the bill. The defendant has retained possession of the holograms.

**Legal Standard:**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c).

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Donahue v. Windsor Locks Bd. of Fire Commissioners, 834 F. 2d 54, 58 (2d Cir. 1975). "[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. The trial court's function is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined  . .  to issue–finding; it does not extend to issue–resolution." Gallo v. Prudential Residential Services, 22 F. 3d 1219, 1224 (2d Cir. 1994).

Summary judgment should not enter only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving

party". <u>Anderson</u> 477 U.S. at 248 (internal quotations omitted).  A material fact is one that would "affect the outcome of the suit under the governing law".  <u>Id.</u> The materiality determination rests on substantive law [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.  <u>Id.</u>  Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.   When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.

The moving party on a motion for summary judgment has a heavy burden.

> When reviewing the evidence on a motion for summary judgment the court must "assess the record in the light most favorable to the non-movant and draw all reasonable inferences in its favor.  Because credibility is not an issue on summary judgment, the non-movants evidence must be accepted as true for purposes of the motion.   Nonetheless, the inferences drawn in favor of the non-movant must be supported by the evidence. "Mere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  . . .  [T] here must be evidence on which a jury could "reasonably find" for the non-movant.

<u>Shrestha v. Nadel</u>, 2001 U.S. Dist. Lexis 12553 (Thompson, J.)  The non-moving party cannot rest merely on the pleadings.

> Although the moving party bears the initial burden of establishing that there are no genuine issues of material

> fact if the movant demonstrates an absence of such
> issues, a limited burden of production shifts to the non-
> movant, which must "demonstrate more than some
> metaphysical doubt as to the material facts, . . . [and]
> must come forward with specific facts showing that there
> is a genuine issue for trial. . . .

The question is "is there sufficient evidence to reasonably expect that a jury
could return a verdict in favor of the non-moving party". <u>Shrestha</u> @ 2 citing
<u>Anderson</u> 477 U.S. at 248, 251.

## ARGUMENT:

### I)      <u>At a minimum there is a genuine issue of material fact as to whether or not the plaintiff and the defendant entered into a contract for the purchase and sale of 10 million WWF holograms.</u>

This case is governed by the Uniform Commercial Code as it governs
contracts for the sale of goods.  Conn. Gen. Stat. § 42a-2-102[1].

42-2-104 defines merchants as

> (1) . . . a person who deals in goods of the kind or
> otherwise by his occupation hold himself out as
> having knowledge or skill peculiar to the practices or
> goods involved in the transaction . . .

> (3) "Between merchants" means in any transaction
> with respect to which both parties are chargable with
> the knowledge or skill of merchants.

Clearly, given the prior orders from Jakks to the plaintiff for identical
products, this transaction would be deemed as one between merchants.

---

[1] The defendant's memorandum makes no mention of the UCC.

Further, Conn. Gen. Stat. § 42a-2-204 governs the formation of a contract in general. It provides,

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
>
> (2) A agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
>
> (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

The UCC does not treat an open term as defeating a contract if there is a reasonable commercial basis for supplying the term. (See Conn. Gen. Stat. § 42a-2-204 cmt.) See also Nora Beverages, Inc. v. Perrier Group of America, Inc. (64F. 3d 736 (2d Cir. 1998).

Conn. Gen. Stat. § 42-2-206 governs offer and acceptance in the formation of a contract under the UCC. It provides,

> (1) Unless otherwise unambiguously indicated by the language or circumstances, (a) an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances; (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance, either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods, but such a shipment of nonconforming goods does not constitute

> an acceptance if the seller seasonably notifies the
> buyer that the shipment is offered only as an
> accommodation to the buyer. . . .

*        *        *

As the comment to this section of the Code makes clear the purpose of these provisions of the code is to promote flexibility in the creation of contracts for the sale of goods.   Comment 1 notes that any reasonable manner of acceptance is intended to be available.   "The section is intended to remain flexible and its applicability to be enlarged as new media of communication develop or as more time saving present day media come into general use."

Thus, under the circumstances there was a sufficient basis to establish that a contract existed.  On January 15, 2002 the plaintiff submitted, in response to the defendant's request, a written quote.  If it was not, as suggested by the defendant, a document containing general information about the terms at which it offered WWF holographs for sale.   (See Ferrera testimony, Ex. B, pp. 26-30; Ex. A; Pauly testimony, Ex. C, pp. 59.)  This characterization makes it appear as though it was a general flyer.  The quote identified the nature of the goods to be sold, the quantity of same, the price and the delivery date.   This quote was accepted by the defendant, as manifested by the e-mail from Stacy Pauly to the plaintiff.  "I'll need to place an order for 10,000,000 stickers.  Please let me know what you need from me to place this order.  I'm assuming that we already have some sort of account in place."  (Ex. D.)  The e-mail response from Ferrera (Ex.

E) confirms the meeting of the minds. "Hi Stacy **and thank you for the order**. Just your standard P.O. information: Bill to, Ship to, Shipping method and requested delivery dates will be fine. You are credit approved for the order. Thanks again." At that moment, the contract between the parties had been created.

The conduct of the parties after the e-mail exchange provides a window into their intentions as of January 16, 2002. Ferrara's testimony in that he then got the approval he needed from the WWF due to material lead times so as to comply with what were expected to be tight delivery deadlines. (Ex. F.) The plaintiff began to manufacture the product based upon the approval from the WWF. (See Ferrera testimony, Ex. B, pp. 29-30; Mahoney testimony, Ex. H, pp. 14-18.)

Jakks likewise acted as if it had an order. The order was approved by Stephen Berman, the president of the defendant. (See Answers to Requests for Admission dated April 2, 2004 and Exhibits B and C annexed to the plaintiff's Requests for Admission, Ex. P.)

The e-mails between Pauly and Rickelmann when Rickelmann assumed responsibility for the purchase are also illustrative. (Exs. M, N, and O.) Rickelmann asks for the cost of the special labels. In reply, Pauly provides the information and state, "I have the **original** signed estimate from Stephen Berman . . . "

Pauly's e-mails after May 28, 2002 are revealing to the extent that she claims that "she spoke to George and told him that she would be ordering stickers soon". This is different from her original mail. What is interesting is that she purportedly knew about the pending logo change at that time but never communicated this to the plaintiff. (Ex. O, 6/5/2002.) In her deposition she claims not to recall when the logo change took place. (Ex. C, pp. 39.) What is clear however is that she never told the plaintiff about it until after the stickers were manufactured. (Ex. C, pp. 40-41.)

Pauly's subsequent e-mails did not sufficiently disabuse the plaintiff of the notion that it had an order. See Conn. Gen. Stat. § 42a-2-204(s) requiring a disavowel of a written confirmation. Her subsequent e-mail is equivocal at best. Certainly if she did not believe she had placed an order a more direct response to Ferrera's e-mail confirming the order could have been issued. In addition, Pauly had no recollection, nor e-mails to demonstrate that she was contacting someone in Hong Kong to obtain the shipping information. (See Pauly testimony, Ex. C, pp. 36-38.) Most revealing is Ferrera's statement captured in his April 3, 2002 e-mail to Florence DiGeorgio wherein he relates that "Stacy Pauly told me that her orders are on hold." When questioned about having made this statement Pauly could not refute it. (Pauly Testimony, Ex. C, pp. 68-69.) Clearly, based upon the May 28, 2002 e-mail from Stacy Pauly to Andy Rickelmann, she thought that an order had been placed noting that she had a

signed estimate from Stephen Berman.  (Pauly testimony, Ex. C, pp. 47-49; Ex. M; Ex. P.)

The defendant's argument that there was no contract because no formal purchase order was issued is of no moment, either legally or factually.  Under the UCC no such document was required.  The only purpose a purchase order number in Jakks system served was an internal accounting function.  (See Pauly testimony, Ex. C., pp. 13-16.)  It had nothing to do with a third party's entitlement to rely on the same.  If the purchase order number had such talismanic qualities that information could have been communicated to the plaintiff by Pauly or some other person in the Jakks purchasing department.  It was not.

In addition, it was commonplace for DuPont to produce goods for customers notwithstanding the absence of a specific purchase order.  In its dealings with Jakks, DuPont's predecessor billed to a name reference in lieu of a specific purchase order.  Thus, the lack of a purchase order number on the bill is meaningless.  (See Ferrera testimony, Ex. B, pp. 55-56; Foster testimony, Ex. (I, pp. 13.)

The defendant argues that Ms. Pauly never placed an order because the shipping information, etc. requested in Mr. Ferrera's January 16, 2002 e-mail was never provided.  Pauly contends that no order was created.  This is contrary to the history between the parties in which those details were the same.  This knowledge is borne out by Pauly's testimony (Ex. C, pp. 30-31) wherein she

testifies that DuPont was the company from whom they purchased the stickers before . . . "And it would have been all the same circumstances, the same pricing, everything from then (sic)." Thus, the shipping instructions were immaterial to the creation of this contract.

Ferrera's testimony is that he did not need shipping instructions in order to produce the order. This is borne out by the testimony of William Mahoney, the plaintiff's production manager, as well. Moreover, shipping requirements would not be a reason to hold up a production project. Whether the labels were going to be shipped via boat or air freight is simply of no moment. These inconsequential details are simply not a reason to reject this contract under the UCC.

The defendant argues that the Ferrera e-mail of January 17, 2002 (Ex. F) to Florence DiGeorge of the WWF demonstrates that there was never an order. Ferrera's deposition testimony on this point shows that this was a standard practice of his whenever he received an order and that the language is merely phraseology. Certainly there is a genuine issue of fact as to his intention in using the language he did. His position is that he had an order.

The defendant also makes much of the Ferrera e-mail dated April 3, 2002 to Florence DiGiorgio arguing that it proves that as far as DuPont was concerned it did not receive an order. This interpretation is refuted by Ferrera's testimony wherein he describes this as a terminology issue. He testified that Pauly had

informed him that she was canceling the order. To cast this e-mail as an admission is a two edged sword insofar as it also refers to Stacy advising him that "all her orders are on hold". Thus, if she admitted to Ferrera that her "orders" were on hold, and his testimony is believed, she therefore knew that she had placed an order. (See Ex. K.) Interestingly, Pauly claims to have no recollection of advising Ferrera of using that phraseology.

In viewing these writings in their context the most significant evidence which exists is what DuPont did. DuPont manufactured these specialty products for the defendant. What motivation could it have had to produce these products, and incur the expenses in connection with same unless it reasonably believed it had received an order from the defendant. The subject goods were not stock inventory items which were being dumped on the defendant after termination of the plaintiff's agreement with the WWF. To the contrary, they were specifically manufactured custom products. The defendant cannot, absent speculation, explain away this essential fact. The immaterial peripheral evidence alluded to is just that and does not explain away the most important indicator of the parties' intent. Moreover, the first indication that the plaintiff received from the defendant that there was a problem was on April 10, 2002 when it was notified by Stacy Pauly that her orders were on hold. Thus, after a flurry of activity in early through mid January, the e-mails from Ms. Pauly dry up. This was the time when she was allegedly trying to find out shipping information and the like. Except there is

no documentary evidence of her activities (e-mails or the like), nor could she testify to what she was doing to obtain this information.  (See Pauly testimony, Ex. C, pp. 37-38.)  The reason that there is no evidence is because she knew this information was not material to the order and that it could be supplied later or could be shipped as was the parties' prior practice.  She knew the order was being processed and her conduct from mid January, 2002 to May, 2002 demonstrates her knowledge.

## II)    Pursuant to the UCC's statute of frauds provisions the parties entered into a binding enforceable contract.

Conn. Gen. Stat. §42a-2-201 represents Connecticut's codification of the Statute of Frauds in the UCC.

> (1)    Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.  A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

> (2)    Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless

written notice of objection to its contents is given within
ten days after it is received.

(3) A contract which does not satisfy the requirements of
subsection (1) but which is valid in other respects is
enforceable (a) if the goods are to be specifically
manufactured for the buyer and are not suitable for sale
to others in the ordinary course of the seller's business
and the seller, before notice of repudiation is received
and under circumstances which reasonably indicate that
the goods are for the buyer, has made either a
substantial    beginning    of    their    manufacture    or
commitments for their procurement; or (b) if the party
against who enforcement is sought admits in his
pleading, testimony or otherwise in court that a contract
for sale was made, but the contract is not enforceable
under this provision beyond the quantity of goods
admitted; or (c) with respect to goods for which payment
has been made and accepted or which have been
received and accepted as provided by section 42a-2-606.

Pursuant to comment 1, "The only term which must appear is the quantity term

which need not be accurately stated". The price, time and place of payment or

delivery, the general quantity of the goods or any particular warranties may all be

omitted.

Thus under the statute of frauds the parties clearly had an enforceable

contract. There were two writings which specified the terms, the price and the

specific product which were followed by a confirmatory e-mail. The Ferrara e-

mail thanking Pauly for the order (written confirmation pursuant to subsection (b)

above) was unobjected to. Thus, the essential terms of a contract, not every

single item, were set forth therein. Keefe v. Norwalk Cove Marina, Inc. 57 Conn.

App. 601.  <u>cert.</u> <u>den.</u> 254 Conn. 903 (2000).  Moreover, pursuant to subsection (3) there is no doubt but that the goods were specifically manufactured for this defendant.  The repudiation of the order occurred in April, 2002.  At that time the horse was out of the barn as the goods were manufactured and awaiting shipping instructions.

Clearly under any construction of these documents an enforceable contract was created.  At best from the defendant's standpoint there is a genuine issue of material fact such that its motion should be denied.

**CONCLUSION:**

The plaintiff specifically manufactured the holographic labels for this defendant on the basis of correspondence received from the defendant.  Under the UCC a valid enforceable contract was created.  The fact that WWF changed its logo was information known to the defendant which never communicated the same to the plaintiff.  It was only after the defendant realized that it might get "stuck" with these labels did it engage in revisionist history with regard to its order.  This is understandable on the part of the defendant.  The defendant cannot point to, nor was there any motivation for the plaintiff to incur the expense of buying raw materials, incurring labor and other charges to manufacture a special order item for this defendant.  The plaintiff, based upon the chronology of events acted in reasonable reliance on the defendant's order and had a valid contract.  The court should deny the defendant's motion.

Dated at:  Westport, Connecticut

June 7, 2004

                                        **DuPONT AUTHENTICATION**
                                        **SYSTEMS, LLC**
                                        By Its Attorneys,


                                        Alexander J. Trembicki, Esq.
                                        Lynch, Trembicki, Martelon & Boynton
                                        225 Main Street
                                        Suite 103
                                        Westport, CT  06880
                                        Telephone No.:  203.227.6808
                                        Federal Juris No.:  CT 06889

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed, postage prepaid, to all counsel of record on this date, June 7, 2004 as follows:

Bruce Robins, Esq.
Feder, Kaszovitz, Isaacson,
Weber, Skala, Bass & Rhine, LLP
750 Lexington Avenue
New York, NY 10022-1200
(counsel for Jakks Pacific, Inc.)

Toby M. Schaffer, Esq.
Shapiro & Siegel, P.C.
162 Bedford Street
Stamford, CT 06901
(counsel for Jakks Pacific, Inc.)

ALEXANDER J. TREMBICKI